Roman MARCZAK and Ryszard
Kowalczyk, Petitioners–
Appellees,

v.

Joseph R. GREENE, District Director of
U.S. Immigration and Naturalization
Service, Respondent–Appellant.

Nos. 90–1023, 90–1024.

United States Court of Appeals,
Tenth Circuit.

July 23, 1992.

Emily Anne Radford, Atty., Office of Immigration Litigation, Civil Div., Dept. of Justice, Washington, D.C. (Stuart M. Gerson, Asst. Atty. Gen., Civil Div., and Lauri Steven Filppu, Deputy Director, Dept. of Justice, Washington, D.C., James W. Winchester, Asst. U.S. Atty., Denver, Colo., with her on the briefs), for respondent-appellant.

Daniel M. Kowalski of Denver, Colo., for petitioner-appellee Marczak.

Thomas R. Orr of Holland & Hart, Colorado Springs, Colo. (Timothy C. Kingston and Daniel W. Patterson of Holland & Hart, Denver, Colo., with him on the brief), for petitioner-appellee Kowalczyk.

Before SEYMOUR, HOLLOWAY, and ANDERSON, Circuit Judges.

SEYMOUR, Circuit Judge.

Donald H. Russell, District Director of the United States Immigration and Naturalization Service, appeals the district court's order granting Roman Marczak's and Ryszard Kowalczyk's (petitioners) petitions for writ of habeas corpus and ordering that they be paroled pending final disposition of the exclusion proceedings. We reverse.

### I.

On August 15, 1989, a Danish air charter landed in Anchorage, Alaska, carrying a number of Polish seaman who were en route from Poland to a fishing vessel owned and operated by the Polish national government. Sometime before arriving in the United States, several of the crewmembers decided to seek asylum in this country, and they reported to INS officials in Anchorage to request entry. Among the nine sailors who appeared before immigration officials at that time were appellees Kowalczyk and Marczak.[1]

When he filed this appeal, Mr. Kowalczyk was thirty-two years old, with a wife and two children still in Poland. Mr. Marczak, who was twenty-five years old and unmarried when he arrived, has since married an American woman. Both men are members of Fighting Solidarity, a radical political opposition group that resists any cooperation with the former communists in Poland, and that is distinct from the now legal Solidarity Party. They claim that as

---

1. We granted the motion of a third appellee, Jacek Kisielewski, to dismiss his case when he received asylum in Canada. Order, April 20, 1992.

a result of their political activities, they have been repeatedly jailed, beaten, and interrogated, and that their own and their families' safety is in continuing jeopardy in Poland. Consolidated Answer Brief at 6 n. 5; Rec., vol. I, doc. 15 at ex. L. If they were to return to Poland, they claim, they would be subject to similar levels of persecution and physical abuse.

Mr. Kowalczyk and Mr. Marczak were not the first of the nine sailors to speak to immigration officials when they arrived in Anchorage. Four others presented travel documents for inspection and were formally "admitted" into the United States. Once admitted, they were immediately invested with the constitutional and legal rights attaching to those who have already "entered" the country. Accordingly, when the admitted sailors requested asylum, they were detained and placed in deportation proceedings pursuant to 8 U.S.C. § 1252 (1988).[2]

The immigration authorities apparently guessed that the next five men would also request asylum, and they refused to stamp their travel documents. Thus, although Mr. Kowalczyk and Mr. Marczak had obtained in Poland valid C–1 "in-transit" visas permitting them to travel "in immediate and continuous transit through the United States" for the purpose of boarding their ships, *id.* at § 1101(a)(15)(C), they were detained along with the remaining three men, and placed in exclusion proceedings pursuant to 8 U.S.C. §§ 1225–1226.[3] All nine were taken to Wackenhut detention center in Aurora, Colorado.

Through retained counsel (presumably paid for by the local Polish community), petitioners subsequently requested parole pending the determination of their immigration status. *See* 8 U.S.C. § 1182(d)(5)(A); 8 C.F.R. § 212.5. The district director, Donald Russell, denied parole in both cases. In a letter dated September 8, the same day as Mr. Marczak's request for parole, Mr. Russell responded simply, "Your request to parole Mr. Marczak is denied." Addendum to Consolidated Answer Brief for Petitioners Jacek Kisielewski and Ryszard Kowalczyk (hereinafter Addendum), doc. 6. On October 2, Mr. Russell responded in more detail to Mr. Kowalczyk's September 20 request, and denied parole on the grounds that "[p]arole is meant to be the exception and not the rule in exclusion cases," and that "there is a possibility that [he] will abscond to avoid being returned to [his] home country of Poland." Addendum, doc. 8. Mr. Russell also noted Mr. Kowalczyk's lack of family ties in this country and Russell's own belief that the asylum claim would not prove meritorious, and stated that "the continued detention ... is in the public interest." *Id.* An identical letter was sent the same day to Roman Marczak's attorney. Rec., vol. I, doc. 15 at ex. C.

Petitioners filed writs of habeas corpus in district court contesting the denial of parole and alleging that Mr. Russell unlawfully discriminated against them. Following an evidentiary hearing, the district court granted the writs and ordered appellees released on $3,500 bond. The court held that the District Director abused his

---

**2.** The merits of these cases were in part decided in *Kapcia v. INS,* 944 F.2d 702 (10th Cir.1991).

**3.** An alien excluded from the United States, unlike one who has been admitted, possesses extremely limited constitutional rights, and the procedures for exclusion and expulsion are correspondingly less thorough than those for deportation. *See Landon v. Plasencia,* 459 U.S. 21, 25–27, 103 S.Ct. 321, 325–26, 74 L.Ed.2d 21 (1982). "Once an alien gains admission to our country and begins to develop the ties that go with permanent residence, his constitutional status changes accordingly." *Id.* at 32, 103 S.Ct. at 329. When the aliens are detained immediately upon arrival, any such distinction between admitted and excluded aliens is wholly fictional.

This irony, however, is irrelevant to the statutory distinction. *See Garcia–Mir v. Smith,* 766 F.2d 1478, 1484 (11th Cir.1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986); *Louis v. Nelson,* 544 F.Supp. 973, 977 (S.D.Fla. 1982) ("The irony of this distinction is that deportable aliens, many of whom entered the country surreptitiously, are given more rights under the law than excludable aliens who present themselves to immigration.").

Aliens who are finally adjudged excluded are then subject to expulsion, or "deportation." Used in this context, deportation is a synonym for expulsion, rather than a term referring only to the procedures undergone by aliens who have entered the country.

discretion because he failed to make an individualized determination in each case before denying parole. Although the court found no evidence of discrimination, it concluded that appellees did not pose a risk of flight, and that the public interest favored parole over further incarceration. Rec., vol. II, at 81. On appeal, the government contends the court acted outside its authority in holding an evidentiary hearing, applied an incorrect legal standard, and improperly overrode the INS's parole decision.[4]

## II.

Congress has exercised its power over immigration in the Immigration and Naturalization Act, codified at 8 U.S.C. §§ 1101 *et seq.* Its authority in this area is exceptionally broad: "over no conceivable subject is the legislative power of Congress more complete." *Fiallo v. Bell,* 430 U.S. 787, 792, 97 S.Ct. 1473, 1478, 52 L.Ed.2d 50 (1977); *Kleindienst v. Mandel,* 408 U.S. 753, 765–67, 92 S.Ct. 2576, 2583–84, 33 L.Ed.2d 683 (1972). This power is in turn entrusted to the Attorney General, 8 U.S.C. § 1103, whose decisions are accorded a high degree of judicial deference. *Palma v. Verdeyen,* 676 F.2d 100, 104 (4th Cir. 1982).

An alien arriving in this country is subject to immediate assessment by the INS. "Every alien ... who may not appear to the examining immigration officer at the port of arrival to be clearly and beyond a doubt entitled to land shall be detained for further inquiry." 8 U.S.C. § 1225(b). Excludable aliens applying for asylum appear before an immigration judge who initially determines whether exclusion is appropriate. That decision may be appealed, first to the Board of Immigration Appeals (BIA), 8 U.S.C. § 1226(b); 8 C.F.R. §§ 103.3,

236.7, and then to the Court of Appeals for the circuit in which the administrative proceedings were held, 8 U.S.C. § 1105a(a)(2). Pending a final decision on the merits of the asylum claim, an alien either remains in detention or, in the District Director's discretion, is paroled into the community. *Id.* at § 1182(d)(5)(A); 8 C.F.R. 212.5. Appellees Marczak and Kowalczyk went through precisely this process. Once they were found by the Port Director in Anchorage to be apparently excludable under what was then 8 U.S.C. § 1182(a)(20)[5] for failure to possess adequate documentation, they were detained under section 1225(b) and placed in exclusion proceedings. They applied for parole pending the resolution of those proceedings.

## A.

The government contends Congress has always intended that parole be the exception in exclusion cases, and that a recent INS policy directive finally gives effect to that purpose. Consolidated Brief for Appellant at 27, 30. On its face, however, the statute displays no preference for either detention or parole, leaving the matter instead to the discretion of the Attorney General. 8 U.S.C. § 1182(d)(5)(A).[6] Normally, our inquiry into the meaning of a statute would end with its language. *See United States v. Morgan,* 922 F.2d 1495, 1496 (10th Cir.), *cert. denied,* — U.S. —, 111 S.Ct. 2803, 115 L.Ed.2d 976 (1991) (if statute is unambiguous and result not irrational, plain language controls).

The government nonetheless cites the House Report that accompanied the original act in 1952.

> The Committee believes that the broader discretionary authority is necessary to permit the Attorney General to parole

---

**4.** The merits of appellees' asylum petitions are not before us; indeed, resolution of the immigration matters would moot the issue here. We are informed that Mr. Marczak's appeal on the merits is currently before this court, and Mr. Kowalczyk's is still on appeal to the Board of Immigration Appeals.

**5.** This provision is now found at 8 U.S.C. § 1182(a)(7)(A)(i)(I).

**6.** Section 1182(d)(5)(A) states:

> The Attorney General may ... in his discretion parole into the United States temporarily under such conditions as he may prescribe for emergency reasons or for reasons deemed strictly in the public interest any alien applying for admission to the United States....
> ....

inadmissible aliens into the United States in emergency cases, such as the case of an alien who requires immediate medical attention before there has been an opportunity for an immigration officer to inspect him, and in cases where it is strictly in the public interest to have an inadmissible alien present in the United States, such as, for instance, a witness or for purposes of prosecution.

H.R.Rep. No. 1365, 82d Cong., 2d Sess., *reprinted in* 1952 U.S.C.C.A.N. 1653, 1706; *see also Amanullah v. Nelson*, 811 F.2d 1, 6 (1st Cir.1987). Despite the apparent clarity of the quoted language, the Supreme Court observed only six years later that "*[p]hysical detention of aliens is now the exception, not the rule,* and is generally employed only as to security risks or those likely to abscond." *Leng May Ma v. Barber*, 357 U.S. 185, 190, 78 S.Ct. 1072, 1075, 2 L.Ed.2d 1246 (1958) (emphasis added). It is true, as the government argues and as we discuss below, that the parole *regulations* have been rewritten since *Leng May Ma.* The relevant provisions of the *statute*, however, remain intact, and a change in agency policy can obviously not affect statutory intent. At the very least, the government must concede that the policy was once different than it is now, and that the Supreme Court, given the opportunity to comment, did not disapprove of the practices then employed by the INS to effect Congressional intent.

The agency presumption in favor of parole continued until 1981. Faced with large numbers of asylum applicants in the early 1980s (particularly Haitians and Cuban nationals arriving with the "Mariel boatlifts"), and wishing to prevent the "de facto" entry of tens of thousands of immigrants, the INS instituted a new policy of detention without parole for any immigrant who could not present a prima facie case for admission. A class of undocumented

and unadmitted Haitians successfully challenged the new policy as void for failure to observe the notice-and-comment procedures for rule-making under the Administrative Procedure Act (APA), and a district court enjoined the policy's enforcement. *Louis v. Nelson*, 544 F.Supp. 973 (S.D.Fla.1982); *see Jean v. Nelson*, 472 U.S. 846, 850–51, 105 S.Ct. 2992, 2995, 86 L.Ed.2d 664 (1985). The policy was thus invalidated, and the INS immediately promulgated its new policy in compliance with the APA and codified it at 8 C.F.R. § 212.5. *Id.*

As we read the Supreme Court's discussion of immigration parole in *Jean*, the whole of the INS's new policy is contained in the regulation actually enacted after the district court required formal rule-making procedures. *See* 472 U.S. at 851, 105 S.Ct. at 2995. The government concedes as much when it says that "the INS regulations governing · parole *were* in fact changed and made more restrictive in 1982," Consolidated Brief for Appellant at 28 (emphasis added), and that the new regulations "more nearly reflect the intent of Congress," *id.* at 30. Thus, not unless the terms of the regulation itself presume detention over parole is such a presumption in effect. *Cf. Webb v. Hodel*, 878 F.2d 1252, 1255 (10th Cir.1989) ("court is required to give substantial weight to the interpretation made by the agency which is charged with the statute's administration"). *But see, Amanullah*, 811 F.2d at 6–7 (parole is exception to general rule of detention).[7]

 The regulations set forth the agency's understanding of the statutory conditions for parole, namely "for emergent reasons or for reasons deemed strictly in the public interest." 8 U.S.C. § 1182(d)(5)(A). "Emergent reasons" are defined to include "serious medical conditions in which contin-

---

7. Petitioners rely heavily on *Rodriguez–Fernandez v. Wilkinson*, 654 F.2d 1382, 1389 (10th Cir.1981), which noted that physical detention should be the exception. Since that case was decided under the old regulation, however, it does not serve as useful precedent in this case.

Similarly, *Rodriguez–Fernandez*'s conclusion that aliens may only be kept in detention for a

limited time is inapplicable here. That case dealt with Cuban refugees who were both excludable from the United States and not permitted to return to Cuba. Unlike petitioners, who may end their imprisonment at any time by returning to Poland, the detainees in *Rodriguez–Fernandez* were threatened with indefinite imprisonment.

ued detention would not be appropriate," 8 C.F.R. § 212.5(a)(1). Moreover,

> [t]he parole of aliens within the following groups would generally come within the category of aliens for whom the granting of *the parole exception* would be "strictly in the public interest," *provided that the aliens present neither a security risk nor a risk of absconding:*
>
> (i) Women who have been medically certified as pregnant;
>
> (ii) Aliens who are defined as juveniles....
>
> (iii) Aliens who have close family relatives in the United States ...;
>
> (iv) Aliens who will be witnesses in proceedings ... in the United States;
>
> (v) *Aliens whose continued detention is not in the public interest as determined by the district director.*

*Id.* at § 212.5(a)(2) (emphasis added). Nowhere does the regulation purport to offer an exhaustive list of the circumstances in which parole should be granted, nor does it imply in any way that the listed factors are the only ones that ought to be considered. To the contrary, section (a)(2)(v) requires the district director to make a comprehensive determination of whether detention would serve the public interest, *apart* from the enumerated considerations. The only language that arguably supports the government's asserted presumption in favor of detention is the reference to "the parole exception," *id.* at § 212.5(a)(2). Given the lack of any corresponding statement that detention is the "rule," [8] the failure of Congress to state any preference at all, and the general "public interest" clause in the regulation, we conclude that there is no intended presumption sufficient by itself to justify the denial of parole. District Director Russell's duty under both the statute and regulation was to consider whether parole or detention served the public interest. If he did so properly, we must affirm his decision; if he did not, he may not invoke a presumption to justify his actions.

■ Moreover, as a logical matter, we do not see how an immigration official *could* base his decision on a general rule, given the Supreme Court's requirement that the district director "make *individualized determinations* of parole." *Jean,* 472 U.S. at 857, 105 S.Ct. at 2998 (emphasis added). This requirement gives meaning to the regulation and prevents wholesale by-passing of its terms. If the district director could decide, for example, that all aliens whose asylum claims are unlikely to succeed must be detained in the public interest, or that all aliens without family in this country are likely to abscond, he could avoid his obligation to decide the merits of each parole application. Put differently, a district director who decides parole applications on the basis of broad, non-individualized policies engages in the same type of extra-procedural rule-making that was found illegal by the district court in *Louis,* 544 F.Supp. at 993–97. As we have already discussed, Congress has extremely broad power over immigration; the INS, while more limited in its powers than Congress, *see Bertrand v. Sava,* 684 F.2d 204, 212 n. 12 (2d Cir.1982), may also exercise wide latitude in fulfilling Congressional intent and might create definitive parole rules, rather than the current guidelines. So long as the agency has not thought it wise to enact such sweeping rules, however, no single immigration official may take it upon him or herself to set personal policies for groups of parole applicants. Rather, in each case a district director must determine whether a particular person is likely to flee, and whether that person's continued detention would be in the public interest.

### B.

■ The District Director's decision, while invested with considerable discretion, is not entirely immune from judicial review. *Bertrand,* 684 F.2d at 210. The parties have argued extensively over the proper standard of review, both in the district court and on appeal.[9] As a preliminary

---

**8.** Note, for example, that in the next section of the statute, parole is the exception to the general rule of *admission* for refugees. 8 U.S.C. § 1182(d)(5)(B).

**9.** The standard of review of agency action is the same for the reviewing district court as it is for this court. Our review of agency action is deferential to the agency, and lacks the customary

matter, we reject petitioners' argument that under 28 U.S.C. § 2241, they are entitled to the full scope of review available to habeas petitioners seeking to vindicate constitutional rights. The deference due an administrative determination hinges not simply on the petitioners' ability to proceed under the habeas statutes, but rather on the realm of the agency's authority and the nature of the petitioners' dispute. Excluded aliens have no constitutional right to be paroled into this country, and the scope of our review of the INS's parole decision is therefore unrelated to the review we would undertake were a convicted criminal claiming a violation of constitutional rights. "In immigration matters, the scope of judicial review on a petition for habeas corpus is more truncated than in the criminal context." *Amanullah*, 811 F.2d at 16.

We cannot so easily dismiss Mr. Marczak's and Mr. Kowalczyk's contention that the denial of their immigration parole should be reviewed for abuse of discretion. The government vociferously argues that we should instead affirm as long as the district director acted for "facially legitimate and bona fide reasons." Apparently, both parties believe that "abuse of discretion" would afford more sweeping review than "facially legitimate and bona fide."

Judicial language abounds with phrases designed to express exquisite subtlety, precision, and accuracy in the inverse proportions of deference and scrutiny we apply in different legal contexts. We examine, for example, whether district court action was plain error or harmless error, whether a ruling was clearly erroneous or supported by substantial evidence, or whether a law needs to serve a compelling, significant, or important governmental interest. In many cases, the incantation of one of these mantras dictates the result. It is as if by multiplying the standards of review and selectively attaching them, we have turned the law into an objective and knowable science. In this case, as in many, our choice between two proffered standards of review matters only to the extent that they

deference to the district court. *Webb v. Hodel*, 878 F.2d 1252, 1254 (10th Cir.1989); *Mason v.*

are meaningfully and practically different from each other.

We often review district court action for an abuse of discretion. This standard is fairly deferential to the decisionmaker, and assures that the exercise of good judgment will generally be upheld. In a slightly different context, this court has described review for abuse of discretion as a determination

> *"whether the information relied on by the [decisionmaker] is sufficient to provide a factual basis for its reasons. The inquiry is not whether the [decisionmaker]'s decision is supported by the preponderance of the evidence, or even by substantial evidence; the inquiry is only whether there is a rational basis in the record for the [decisionmaker]'s conclusions embodied in its statement of reasons."*

*Misasi v. United States Parole Comm'n*, 835 F.2d 754, 758 (10th Cir.1987) (emphasis added) (reviewing U.S. Parole Commission's decision on eligible-for-parole date) (quoting *Solomon v. Elsea*, 676 F.2d 282, 290 (7th Cir.1982)); *see Moret v. Karn*, 746 F.2d 989, 991 (3d Cir.1984) (applying abuse of discretion standard to review of immigration parole).

The "facially legitimate and bona fide" standard, by contrast, is used only in the context of immigration. The Supreme Court first articulated the standard in *Kleindienst*, 408 U.S. at 769–770, 92 S.Ct. at 2585, when it refused to reverse the Attorney General's denial of a waiver of exclusion to a prominent Belgian journalist. The Attorney General told Mr. Mandel it had denied the waiver because of previous abuses of other exclusion waivers. The Supreme Court held in response that "when the Executive exercises this power [to make policies and rules for exclusion of aliens] negatively on the basis of a facially legitimate and bona fide reason, the courts will [not] look behind the exercise of that discretion." *Id.* at 770, 92 S.Ct. at 2585.

*Brooks*, 862 F.2d 190, 192 (9th Cir.1988).

Several circuits have invoked this standard in decisions regarding immigration parole under the provisions involved in this case. *See Mason v. Brooks,* 862 F.2d 190, 194 (9th Cir.1988); *Amanullah,* 811 F.2d at 9–10; *Garcia–Mir v. Smith,* 766 F.2d 1478, 1485 (11th Cir.1985), *cert. denied,* 475 U.S. 1022, 106 S.Ct. 1213, 89 L.Ed.2d 325 (1986); *Bertrand,* 684 F.2d at 212.

█ Because the "facially legitimate and bona fide" standard is used relatively infrequently, its meaning is elusive. The Second Circuit has held there was no difference intended by *Kleindienst* between "facially legitimate and bona fide" reasons, and a "rational basis" for statutory classifications. *Azizi v. Thornburgh,* 908 F.2d 1130, 1133 n. 2 (2d Cir.1990). It is tempting to conclude from the broad language of the test that a court applying the "facially legitimate and bona fide" standard would not even look to the record to determine whether the agency's statement of reasons was in any way supported by the facts. On this interpretation, merely asserting a legally permissible justification would support a denial of parole (or other discretionary immigration decision), regardless of whether the justification factually applied to the individual in question. This has not, however, been the practice of any of the courts that have adopted the standard in immigration matters. In *Kleindienst* itself, for example, the Supreme Court ascertained that Mr. Mandel had in fact violated the terms of his earlier waivers of exclusion where the Attorney General cited the violations as justification for denying Mr. Mandel entry into the country. 408 U.S. at 756–58 and n. 5, 92 S.Ct. at 2578–79 and n. 5. Similarly, the First Circuit in *Amanullah* first decided that the district director had advanced facially legitimate reasons for denying parole, and then concluded after further examination that "[t]hese findings [were] not without record support." 811 F.2d at 11. When the Ninth Circuit denied parole because of an applicant's prior convictions in this country, it both verified the fact of conviction and satisfied itself that any factual errors cited in the district director's statement of reasons (number of months spent on active military

duty, mislabelling of offense as narcotics trafficking rather than possession of marijuana with intent to distribute) were not factors in the denial of parole. *Mason,* 862 F.2d at 194; *see also Adams v. Baker,* 909 F.2d 643 (1st Cir.1990) (where facts found by consular officer in issuing visas were not subject to judicial review, facially legitimate and bona fide standard meant review for whether evidence existed to form reasonable grounds for belief); *Garcia–Mir,* 766 F.2d at 1485 (Cuba's agreement to take back Mariel immigrants formed factual basis for conclusion of increased chance of flight); *Bertrand,* 684 F.2d at 213–18 (extensive review of evidentiary record). It thus appears that even under the "facially legitimate and bona fide" standard of review, the district director's decision must be at least reasonably supported by the record.

In sum, we see no meaningful difference between the two standards urged here. Both require considerable deference to the decision of the district director; both nevertheless require a summary examination of the record. The Supreme Court's opinion in *Jean* may be read as saying as much. The Court said of the lower court opinion,

> [t]he court held that [the INS's power to parole or refuse parole] was subject to review on a deferential abuse-of-discretion standard. According to the court "immigration officials clearly have the authority to deny parole to unadmitted aliens if they can advance a "facially legitimate and bona fide" reason for doing so."

472 U.S. at 853, 105 S.Ct. at 2996. The Court thus conflated the two standards by referring to them together, as if they were identical. *See also Moret,* 746 F.2d at 993 n. 3 (alternate holding under facially legitimate and bona fide standard has same result as abuse of discretion review). In concluding that there is no practical difference between applying one standard or the other, we do not take license, nor could we, to re-weigh the facts underlying the district director's decision. *See Bertrand,* 684 F.2d at 214 (district court improperly substituted its judgment for that of district director as to likelihood of parole). We

merely require the district director to have articulated *some* individualized facially legitimate and bona fide reason for denying parole, and *some* factual basis for that decision in each individual case.

### C.

There remains one matter to be decided before we can properly evaluate the appeals at hand. According to the government, the district court overstepped its authority in granting an evidentiary hearing when it ought to have relied only on the administrative record. If this is true, then the record must be similarly limited on appeal. As support for this position, the government points to both the narrow review appropriate to parole decisions, and the statutory requirement that judicial review of exclusion and deportation decisions on the merits be "determined solely upon the administrative record upon which the deportation order is based." 8 U.S.C. § 1105a(a)(4).

■ The regulations do not set out any specific procedures for making parole decisions. Excluded aliens have no right to be paroled into this country, *see Alvarez–Mendez v. Stock,* 941 F.2d 956, 963 (9th Cir.1991), *petition for cert. filed,* —— U.S.L.W. —— (U.S. May 27, 1992) (No. 91–8424); *Rodriquez–Fernandez v. Wilkinson,* 654 F.2d 1382, 1386 (10th Cir.1981), and the decision to grant parole rests almost entirely in the hands of the district director. If a district court reviewing the denial of parole finds sufficient evidence in the administrative record to provide a basis for review, it need not hear evidence, nor may an alien claim a right to a hearing. *Cf. Knauff v. Shaughnessy,* 338 U.S. 537, 544, 70 S.Ct. 309, 313, 94 L.Ed. 317 (1950) ("[w]hatever the procedure authorized by Congress is, it is due process as far as an alien denied entry is concerned"). In affirming a district court's decision not to grant a full hearing, the First Circuit reached the same conclusion on the ground

that if *deportation* must be reviewed on the administrative record, then proceedings related to *exclusion* may not be subjected to greater scrutiny. *Amanullah,* 811 F.2d at 16–17. *But cf. Nguyen Da Yen v. Kissinger,* 528 F.2d 1194, 1203–04 (9th Cir. 1975) (district court may require INS to develop certain facts in habeas action).

■ This case, however, poses the different question whether a district court that *does* grant an evidentiary hearing on denial of immigration parole has overstepped its authority. Despite the evident agreement among the circuits that aliens may not demand one as a matter of right, no circuit has ever held a district court's conduct of such a hearing to be error. "While a petition for habeas corpus directed at the INS is usually reviewed by reference only to the administrative record, the District Court may, if necessary, conduct a hearing to take evidence concerning illegal action that is not reflected in the record." *Johns v. Dep't of Justice,* 653 F.2d 884, 896 (5th Cir.1981). In *Bertrand,* although the Second Circuit held that the lower court improperly "substituted its judgment for that of the INS District Director" in a parole decision, it accepted without criticism the evidentiary hearing that formed the basis of the lower court's review, and it relied heavily on the facts presented there. *Bertrand,* 684 F.2d at 213–18. *See also id.* at 219–20 (Kearse, J., concurring) ("To the extent that the district court was making credibility assessments, its review was consistent with the strictures of *Kleindienst*['s]" facially legitimate and bona fide standard.)

We will not forbid a district court from conducting an evidentiary hearing, nor will we disregard the evidence adduced from it. Unlike the "copious" administrative record relied on in *Amanullah,* 811 F.2d at 17, the administrative record before the district court here consisted of nine pages, including the letters requesting and denying parole.[10] The district court could not, under

---

**10.** There is a similar problem with analogizing, as the government would, the permissible record on review in this situation to that mandated by 8 U.S.C. § 1105a(a)(4). The adminis-

trative record which must serve as the sole basis for judicial review of exclusion and deportation orders includes the transcript of the full evidentiary hearing had before the immigration judge,

the applicable standard, re-evaluate the evidence presented at the hearing and decide on its own whether the agency's decision was wise. It could, however, grant a hearing for the limited purposes of ascertaining the grounds asserted by the district director for denial, and ensuring that each decision was given individualized consideration.

### III.

The district court conducted the hearing primarily as an offer of proof by both parties. Attorneys for petitioners and the government addressed their respective understandings of the relevant law, and summarized for the court the evidence they intended to prove. In addition, the court allowed abridged testimony from two witnesses, Tamara Proch (a spokesperson from the Denver Polish community) and District Director Russell, as well as from petitioners.

Mr. Russell stated that he denied parole on the basis of the petitioners' crewman books, "the INS documentation as to what had happened," and the initial interviews by an immigration officer. Rec., vol. II, at 72. He did not read petitioners' asylum applications until after he denied their parole requests. In Mr. Kowalczyk's case, the evidence revealed "that he had no relatives, no ties here in the United States. He came to the United States with a C1 transit visa to join a fishing vessel, which he did not do. He was taken into custody in Anchorage, Alaska, on August 15. He was transferred down to Denver on August 16." Id. at 73.[11]

■ Because petitioners did not fit any of the specific categories of parolable aliens, Mr. Russell initially evaluated them under the general public interest prong. Under the regulation, "a denial of parole should be based on an affirmative determination that the public interest warrants continued detention." Li v. Greene, 767 F.Supp. 1087, 1090 (D.Colo.1991). Mr. Russell's denial letters, however, contained only the terse conclusory statement, devoid of all factual or even hypothetical support, that parole was not in the public interest. Addendum, doc. 6; rec., vol. I, doc. 15 at ex. C. Under any reasonable interpretation of the standard, Mr. Russell was required to give facially legitimate and bona fide reasons, factually supportable, for finding detention to be in the public interest. There is no evidence that he considered in any meaningful or reviewable way whether or why the public interest required that Mr. Marczak and Mr. Kowalczyk be held in custody. Thus, he failed to satisfy even the minimal requirements imposed on him. See Li, 767 F.Supp. at 1090.

At the hearing, however, Mr. Russell seems to have abandoned the public interest justification entirely. According to the terms of the statute and the regulation, then, the only remaining possible rationale for denying parole would be a legitimate finding that petitioners posed a flight or security risk. In direct response to the government attorney's question, Mr. Russell "[told] the Court why [he] denied parole" based on the evidence he had:

> We looked to see if the people were ill, that they were minors. They were all adult males. We considered the fact if or not they had any relatives or close ties to the United States, which they did not, the fact that they were single with no

---

the procedures for which are carefully laid out in 8 C.F.R. §§ 236.2, 242.15. There are no standard procedures for a decision to grant or deny parole, however, and the administrative record of a parole decision may therefore consist (as it did here) of only a few pages. Indeed, as Mr. Marczak points out, District Director Russell's initial denial of parole contained no reasons or evidence at all. A district court that could not order an evidentiary hearing would be bound in similar cases to reverse the administrative decision, because there would be no evidence in the administrative record whatsoever to support it. To restrict judicial review of parole decisions to the same record as deportation decisions is simply to ignore the important differences between those two records.

11. Mr. Russell did not similarly detail the information he gleaned from Mr. Marczak's application. Since the petitioners underwent identical procedures upon arriving in Alaska, however, and since no one has suggested otherwise, we have no reason to believe that Mr. Russell possessed any more information about Mr. Marczak than he did about Mr. Kowalczyk.

ties to the United States. *There was a good possibility over my 33 years of experience that they could abscond* at some—and they don't always know this initially. Many times when they get involved in a community or with other individuals, they'll make that decision subsequent to their release.

Rec., vol. II, at 66 (emphasis added); *see also* Consolidated Brief for Appellant at 9–10. Further questioning demonstrated Mr. Russell's understanding of the INS regulations on parole and his apparent belief that the factors set out in 8 C.F.R. 212.5 were the exclusive grounds for granting parole.

Q: What is the basis for a determination whether parole is granted or denied in the discretion of the INS?

A: ... [I]t's been my understanding in cases like this with refugee cases that parole is an exception rather than the rule, and this is the interpretation of the INS.[12]

Q: Has the INS issued certain criteria for when parole will be granted?

A: Yes they have. The commissioner published a directive back in 1983, and I have gone by that directive.

Q: Is it also in CFR?

A: Yes, it is. The basis of that policy memorandum is now the 8 CFR.

Rec., vol. II, at 67.

Mr. Russell's testimony, the bulk of which we have just reproduced, indicates his intention at the hearing to show that the denial of parole was based on his conclusion that Mr. Marczak and Mr. Kowalczyk were likely to flee. Taken together, Mr. Russell's written denials and his oral testimony provide three bases for that conclusion: (1) petitioners' lack of family ties in this country; (2) the low probability that they would succeed on the merits of their asylum claims; and (3) Russell's statement that "over [his] thirty-three years of experience ... many times ... they'll make that decision," rec., vol. II, at 66.

■ We cannot say that Mr. Russell abused his discretion in reaching his initial decision to deny parole. Nonetheless, his reasons provide only a frail foundation for the conclusion they are asked to support. While Mr. Russell claimed to have extensive experience of aliens with no family ties and improbable asylum claims, he offered no specific example of such an alien fleeing the jurisdiction, nor did he say anything specific about his experiences.

Mr. Russell also neglected to say why and how his determination either was or was not affected by the evidence of significant local support for petitioners. Tamara Proch testified that the Polish community had volunteered homes, appropriate jobs, and individual sponsors for petitioners. Rec., vol. II, at 43–53. *See Bertrand*, 684 F.2d at 214–17 & n. 15 (considering aliens' ability to support themselves on parole and availability of non-organizational sponsors); *Li*, 767 F.Supp. at 1091 (district director must explain why support of community is not functional equivalent of family support). The Polish community had raised money for bond and other expenses, *see Bertrand*, 684 F.2d at 214–15 & n. 15, and had flown an expert from Washington to Denver to testify on behalf of the nine asylum seekers. Rec., vol. II, at 48.

---

**12.** The government argued below, unsuccessfully, that the petitioners were "refugees" and thus fell under the parole provisions of The Refugee Act of 1980, that "the Attorney General may not parole into the United States an alien who is a refugee unless the Attorney General determines that compelling reasons in the public interest with respect to that particular alien require that the alien be paroled into the United States rather than be admitted as a refugee." 8 U.S.C. § 1182(d)(5)(B). This provision limits the use of parole (which by statute does not constitute "entry" into the country) instead of formal admission for asylum-seekers who have been found to be refugees. Under that section, parole is indeed the "exception" for refugees, but the "rule" is not detention, but admission. *See supra* at n. 5. Moreover, the provision made no change at all, nor was it intended to, to the terms of the parole provisions for non-refugees. *Amanullah v. Nelson*, 811 F.2d 1, 12–13 (1st Cir.1987) (Congress had "unambiguous wish ... that the parole authority stay exactly as it was vis-a-vis *nonrefugee* aliens").

Petitioners did not, to our knowledge, apply for refugee status at any time, and the district court therefore correctly held that petitioners were not refugees within the scope of the Refugee Act.

■ Neither we, nor the district court, can evaluate this information *for* Mr. Russell. In reversing the district director and granting parole, the district court impermissibly substituted its own judgment for that of the District Director. Nevertheless, we understand the district court's frustration with Mr. Russell's cursory oral justifications for denying parole. While Mr. Russell offered a permissible reason for denying parole, namely the risk of flight, we hope district directors will in the future articulate the evidence supporting their parole decisions so that we may easily determine whether the underlying rationale is facially legitimate and bona fide, and supported by facts particular to each petitioner.

### IV.

■ Because the district court improperly re-weighed the evidence and made its own findings of fact, we must reverse its decision to grant the writ. In so doing, however, we cannot ignore the shifting factual backdrop to this case. Mr. Marczak and Mr. Kowalczyk have now been living in the Denver area for more than two and a half years, since December 1989. During this time, Mr. Marczak has married an American citizen and has asked the INS to reopen his case on that account. Both men may have developed further networks of personal and professional relationships. To our knowledge, they are still present in the jurisdiction and reporting to parole authorities. Rather than simply ordering the district director's decision reinstated, we think "it is appropriate that the INS district director be given the opportunity to reexercise [his] discretion" in light of *all* the current circumstances. *Bertrand,* 684 F.2d at 219.

We expect that on remand, the district director will take account of all the information now available to him which bears on the appropriateness of parole. His consideration of the public interest and the likelihood of flight should at least include an assessment of the Polish community's support of petitioners and its effectiveness, the petitioners' conduct on parole to date, their compliance with immigration and parole rules, their current ability and demonstrated willingness to support themselves financially, Mr. Marczak's marriage, and any other changed circumstances.

Accordingly, we REVERSE and REMAND for further proceedings consistent with this opinion.