**Anwar HADDAM, Petitioner,**

v.

**Janet RENO, et al., Respondents.**

**Civil Action No. 98–1579–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

June 22, 1999.

---

Malea Kiblan, Kiblan & Battles, Mc-Lean, VA, Susan Akram, Boston University Civil Litigation Program, Boston, MA, for petitioner.

Janet Reno, Attorney General of the Unites States, Washington, DC, pro se.

Doris Meissner, Commissioner, Immigration and Naturalization Service, Washington, D.C., Warren Lewis, District Director, Washington District Office, Arlington, VA, Frank Drew, Sheriff, Virginia Beach Correctional Center, Virginia Beach, VA, for respondents.

Joyce A.N. Massey, McCarthy & Massey, P.C., Manassas, VA, for Colonel Glenn Hill.

## ORDER

ELLIS, District Judge.

The matter comes before the Court on Anwar Haddam's petition for writ of habeas corpus. By Order dated April 27, 1999, and for the reasons set forth in *Haddam v. Reno,* 54 F.Supp.2d 588 (E.D.Va.1999), ten of the petition's fourteen counts were dismissed for lack of jurisdiction or as moot. At issue now are the four surviving

counts—Counts 1 through 4—challenging the district director's discretionary decision to revoke petitioner's parole and deny petitioner's request for release on bond and conditions. The parties have had ample opportunity to brief and argue the issues raised by these four counts, and the matter is now ripe for disposition. For the reasons set forth herein, the petition must be denied.

## I.

The facts of this case are set forth in detail in *Haddam v. Reno*, 54 F.Supp.2d 588, 589–90 (E.D.Va.1999), and need not be fully recounted here. Instead, a brief summary suffices, with emphasis on those facts pertinent to the district director's discretionary decision to continue petitioner's incarceration.

Haddam, a former member of the Algerian parliament, entered the United States in 1992 on a visitor's visa and applied for asylum in 1993. Roughly three years later, in December 1996, the Immigration and Naturalization Service (INS) revoked Haddam's parole status, and placed him in detention. Shortly after his incarceration, exclusion proceedings against Haddam commenced. He has been incarcerated continuously since then, a period now exceeding two and a half years.

The exclusion proceedings have progressed at little more than a snail's pace, and are ongoing. Although the pace and course of the proceedings are not an issue here,[1] a brief summary is nonetheless in order. Prior to the hearing on the merits,

the parties stipulated (i) that Haddam had a well-founded fear of persecution should he return to Algeria and (ii) that he was excludable.[2] In reaching the merits of Haddam's asylum application, the first Immigration Judge (IJ) refused to examine secret evidence proffered by the INS, but nonetheless found Haddam to be a persecutor of others, and therefore statutorily ineligible for asylum.[3] On appeal, the Board of Immigration Appeals (BIA) rejected the IJ's finding that Haddam was a persecutor of others and remanded, directing the IJ to consider the secret evidence. On remand, a second IJ[4] reviewed the secret evidence, heard additional testimony, and has yet to issue a decision.

This is Haddam's second petition seeking release pending resolution of his asylum claim. The first, filed just over a month after his exclusion proceeding began, was denied at a hearing on January 17, 1997.[5] Haddam contends that two additional pieces of evidence warrant a second review of the district director's refusal to release him, namely, i) a December 1996 Department of State letter to the INS stating that "the prolonged detention of this highly visible Algerian political figure[6] could also fuel hostility to American interests in Algeria," and ii) a January 27, 1997 Department of State letter stating that "Algerian officials have not offered any evidence to support the allegations" in the Interpol warrant charging Haddam with "participation in a terrorist group abroad, distribution of information inciting terrorist acts, bringing attacks against the interest of the State, and forgery of official documents."[7] The second petition is

---

1. Haddam has filed a separate mandamus action to compel an immediate decision in his exclusion proceeding. *See Haddam v. Rooney*, Civ. No. 99–719–A (E.D.Va. May 19, 1999).

2. *See* 8 U.S.C. § 1182(a)(7)(A)(i)(I).

3. *See* 8 C.F.R. § 208.13(c).

4. The first IJ recused himself because he was still unwilling to consider the secret evidence.

5. *See Haddam v. Carroll*, Civ. No. 97–45–A (E.D.Va. Jan. 17, 1997).

6. Haddam is the head of the Algerian Islamic Salvation Front (FIS) Parliamentary Delegation in Exile.

7. The letter also stated the Department of State's concerns about "Haddam's expressions of support for the GIA, a terrorist organization whose interests are inimical to the interests of the United States," but recognized

based in large part on this additional information.

Central to disposition of this petition are the reasons and facts on which the district director relies in denying Haddam's requests for release. It is therefore important to set out those reasons and facts in some detail. In this regard, the district director has stated the reasons and facts on four occasions.

First, in a letter dated January 6, 1997,[8] then district director William J. Carroll concluded that Haddam did not meet the standards for release because he presented a risk of absconding. This conclusion, it appears, was based on Haddam's financial ability to travel easily, and on Haddam's prior use of opportunities for advance parole to travel to countries not listed in his advance parole requests. In this January 1997 letter, the district director also noted that Haddam had not set forth any factors to support his assertion that it would be in the public interest to release him, and that Haddam did not fall within any of the five categories of individuals for whom release would generally be in the public interest, citing 8 C.F.R. § 212.5(a)(2).[9]

Second, in a letter dated April 1, 1997, district director Carroll adhered to his decision not to parole Haddam, reiterating that Haddam had been determined to be at a risk of absconding, and not within the five groups listed under 8 C.F.R. § 212.5. The district director also stated that since the earlier request for parole release, the INS had learned from INTERPOL of the existence of three international warrants for Haddam's arrest in connection with alleged violent activity, including murder and activities related to terrorism.

The third and fourth occasions occurred more recently, both in the course of this suit. In a May 10, 1999 letter, Warren Lewis, Carroll's successor as the INS district director, provided a statement of the reasons for continuing to deny Haddam's request for release, namely that the new factors set forth in Haddam's June and September 1997 requests for bond redetermination did not warrant a change in the district director's prior decisions, and that Haddam did not meet the standards for release of 8 C.F.R. § 212.5(a)(5). Specifically, the district director found (i) that there was no public benefit served by Haddam's release, (ii) that Haddam posed a security threat to the United States, and

that the Department of State had no evidence of illegal activities on Haddam's part.

**8.** The record copy of this letter is actually dated "January 6, 1996," which must be a typographical error given that Haddam was not incarcerated in January 1996.

**9.** 8 C.F.R. § 212.5(a)(2) was amended in 1997, after Carroll's January, 1997 letter. *See* 62 Fed.Reg. 10312, 10348 (March 6, 1997). At the time of the letter, § 212.5(a) listed five categories of aliens who would "generally come within the category of aliens for whom the granting of the parole exception would be 'strictly in the public interest,'" namely, i) pregnant aliens, ii) juvenile aliens, iii) aliens with close relatives in the United States who have filed immigration petitions on their behalf, iv) aliens who are witnesses in legal proceedings, and v) aliens whose continued detention is not in the public interest as determined by the district director. Specifically in relation to these factors, the district director stated in the letter that Haddam's wife and children could not confer any immigration

benefits on him at that time, and that there was no showing that Haddam had contributed positively to United States society.

8 C.F.R. § 212.5(a) now states that: "The parole of aliens within the following groups who have been or are detained in accordance with § 253.(b) of (c) of this chapter would generally be justified only on a case-by-case basis for 'urgent humanitarian reasons' or 'significant public benefit,' provided the aliens present neither a security risk nor a risk of absconding." The five groups thereafter defined are essentially similar to those defined before the regulation was amended, except that the amended regulation includes as a category aliens with serious medical conditions, and does not expressly include the category of aliens with close relatives in the United States who have filed immigration petitions on their behalf. Also, the district director may in his discretion parole aliens not in these groups into the country under § 212.5(b).

(iii) that there was a risk Haddam would abscond. District director Lewis further stated generally that the INS had not received any recent requests from the Department of State to release Haddam, that INTERPOL continued to post international warrants for his arrest in connection with alleged violent activity, including murder and terrorism, and that Haddam in 1998 in Algeria was convicted *in absentia* of gun-running and sentenced to death.[10]

The district director further elaborated on these reasons and the factual basis in the record for the reasons in his letter dated May 19, 1999. First, he stated that his conclusion that Haddam posed a national security threat was based on (i) the INTERPOL notices for Haddam's arrest [11] and his *in absentia* conviction and death sentence in Algeria in November 1997,[12] ii) a February 1996 Department of State letter describing both Hadam's travel to Syria and the Sudan, countries which sponsor terrorism, while he was on advance parole [13] and Haddam's travel to South Africa at the invitation of a radical Islamic organization that held violent demonstrations outside the U.S. diplomatic mission in Cape Town in July 1995 and damaged the official U.S. consulate and embassy seals in January 1996, and iii) a December 9, 1993 letter sent to the Chicago Asylum Office from the FBI Chicago Field office indicating that Haddam was the subject of an Interpol notice for murder and was considered armed and dangerous.[14] Second, the district director stated that parole would not have been granted had the INS known that Haddam was traveling to Syria or Sudan or that the travel to South Africa was sponsored by a radical anti-American organization named Quibla that had engaged in violent actions against the United States, and that this "indicates to [the district director] that promises or representations [Haddam] make[s] to INS with respect to release are untrustworthy," because his "past actions suggest to [the district director] that [Haddam] may very well dishonor those conditions as [he] did the conditions of [his] advance parole." For this reason, and because Haddam apparently has "the financial means to travel extensively even though [Haddam and his family] have no visible means of income," the district director concluded that Haddam is at risk of absconding. Finally, district director Lewis noted that Had-

---

**10.** The district director also reiterated the points raised in the earlier letters denying Haddam's release.

**11.** The district director noted that although the Department of State Bureau of Democracy, Human Rights and Labor indicated in a January 27, 1997 letter that the Algerian authorities have not offered any evidence to support the warrants' allegations, he was not aware of whether any formal inquiries were made of Algerian authorities, and thus found that this Department of State statement did not outweigh the other factors. He also noted that the warrants apparently had not been withdrawn, and that such notices are taken seriously and cannot be ignored until there is reason to believe they are frivolous or withdrawn.

**12.** The district director noted that some of Haddam's co-defendants in that trial—some of whom were present—received either jail sentences or were acquitted. From this, he concluded that it appeared that "evidence mattered in the trial, and that individual defendant's cases were considered," and thus the trial proceedings, in the absence of contrary evidence, "appear valid" to him. The district director further noted that "[w]eapons smuggling is a serious charge, particularly in Algeria where civil strife has resulted in the deaths of thousands of citizens."

**13.** The district director stated that "the fact that [Haddam] traveled to countries that sponsor terrorism indicates [his] affinity with those states and their policy of supporting terrorism," which "causes [the district director] serious concern about [his] own support of terrorism and the national security risk that poses."

**14.** The district director also asserted that the original decision was on the basis of the much the same documents, namely, i) the INS Chicago Asylum Office's determination to deny his applications for asylum and withholding of deportation, ii) the February, 1996 DoS letter, and iii) the December 1993 FBI letter.

dam's peace initiatives and the 1997 Department of State memorandum, which states that his "prolonged detention ... could ... fuel hostility to American interests in Algeria," do not support his release on parole. The district director further noted that other than the benefit Haddam's family would receive upon his release, the district director is aware of no affirmative public benefit that would result from Haddam's release. He therefore concluded that Haddam does not meet the regulatory criteria for discretionary parole.[15]

In sum, the various district director letters reflect a slight evolution in the reasons asserted for continuing Haddam's detention. Although district director Lewis continues to rely on the facts and reasons originally asserted by district director Carroll, namely risk of absconding and lack of demonstrated public benefit, it is clear that as additional information became available, an additional reason, namely national security, has gained significance and now provides, in district director Lewis's view, an additional, independent basis on which to deny Haddam's request for release.

Haddam offers responses to each of the reasons asserted by the district director. Thus on the issue of the significance of his *in absentia* trial and conviction in Algeria, Haddam offers several Amnesty International (AI) publications reporting on various human rights abuses in Algeria, including *in absentia* trials, which AI concludes fall short of the international standards for fair trials. He further points to the January 27, 1997 Department of State letter stating that "Algerian officials have not offered any evidence to support the allegations" in the INTERPOL warrants. This, her argues, undermines the legitimacy of the warrants relied on by the

district director. In response to the allegations in the February 1996 letter regarding his travel to South Africa, Haddam provides a letter from an individual named Hamid Adams, who stated that Haddam visited South Africa at his invitation, not Quibla's, to meet with government officials, including Nelson Mandela, and that Haddam stayed in his house, never left Cape Town, and never met with anyone other than government officials. Moreover, Haddam asserts that the information the Department of State relied on in making that allegation is demonstrably inaccurate, as the source of that information also claimed Haddam was in South Africa on a date that he was actually in the United States. With respect to his travel to Syria and the Sudan when he was granted advance parole to travel to Turkey, Haddam asserts that the INS knew he was traveling to Syria, and indeed told him that he could do so on the travel document he had without a separate grant of parole.[16] Haddam also asserts that he went to the Sudan because the location of the meeting with the French government for which he was granted advance parole was changed by the French from Turkey to the Sudan after Haddam had left the United States. Further, he states that he has never been informed of any INS regulation requiring every country to be visited while on parole to be listed in the request for advance parole. In response to the district director's finding Haddam's parole is not in the public interest, Haddam notes that the INS had, prior to revoking his parole, granted him parole seven (7) times, each time finding that it was in the public interest for Haddam to carry on his political activities as spokesperson for the FIS.[17] He also notes that his wife and

---

15. He specifically noted that the recommendation of Haddam's wife and children for a grant of asylum does not alter this conclusion.

16. Haddam identifies neither the individual he spoke to at the INS, nor the date this conversation occurred.

17. The record contains the documents for three of these grants of advance parole: the November 17, 1994 grant, the January 3, 1995 grant, and the January 19, 1996 grant. For each of these grants of advance parole, the parole documents reflect that "Emergent humanitarian conditions necessitate Subject's

children have been recommended for approval for asylum. Finally, he also points to the December 1996 Department of State letter to the INS stating that "the prolonged detention of this highly visible Algerian political figure could also fuel hostility to American interests in Algeria."

## II.

Under 8 U.S.C. § 1182(d)(5)(A), the Attorney General has the discretionary authority to parole an alien into the United States temporarily "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [18] This authority has been delegated by the Attorney General to the INS, and more specifically to the district directors. [19] The INS regulation implementing this statute, 8 C.F.R. § 212.5, states more specifically that parole "would generally be justified only on a case-by-case basis for 'urgent humanitarian reason' or 'significant public benefit,' provided the aliens present neither a security risk nor a risk of absconding." [20] This regulation further states that termination of parole, on notice, shall occur i) when the purpose of the parole has been accomplished or ii) when the district director or chief patrol agent believe that neither humanitarian reasons nor public benefit warrants continued parole. [21]

A district director's exercise of discretion on parole is subject to judicial review. [22] In reviewing parole and detention decisions, some courts apply an "abuse of discretion" standard, [22] while others apply a "facially legitimate and bona fide reasons" standard. [23] Although some courts have noted that there appears to be no practical difference between these two deferential review standards, [24] it appears

---

travel abroad. Advance parole is granted under purview of O.I. 212.5 by authority of the District Director, Chicago, Illinois."

**18.** The statute was amended by the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub.L. 104–208, 110 Stat. 3009 (September 30, 1996). Haddam does not dispute the conclusion that the new language, rather than the previous language, is applicable, nor does either party argue that a different result would obtain under the previous language.

**19.** See 8 C.F.R. § 100.2(a) ("The Attorney General has delegated to the Commissioner, the principal officer of the Immigration and Naturalization Service, authority to administer and enforce the Immigration and Nationality Act and all other laws relating to immigration, naturalization, and nationality as prescribed and limited by 28 CFR § 0.105."); 8 C.F.R. § 103.1(g)(2)(ii)(B) ("District directors are delegated the authority to grant or deny any application or petition submitted to the Service, except for matters delegated to asylum officers pursuant to part 208 and § 253.1(f) of this chapter, or exclusively delegated to service center directors, to initiate any authorized proceeding in their respective districts, and to exercise the authorities under §§ 242.1(a), 242.2(a) and 242.7 of this chapter without regard to geographical limitations."); see also Jean v. Nelson, 472 U.S. 846, 854, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985) ("The Attorney General has delegated parole authority to his INS District Directors....") (citing 8 C.F.R. § 215.5).

**20.** See 8 C.F.R. § 212.5(a).

**21.** See 8 C.F.R. § 212.5(d)(2)(i).

**22.** See Marczak v. Greene, 971 F.2d 510, 515 (10th Cir.1992) ("The District Director's decision, while invested with considerable discretion, is not entirely immune from judicial review."); Bertrand v. Sava, 684 F.2d 204, 211 (2d Cir.1982) ("[T]he exercise of administrative discretion on parole requests by unadmitted aliens may be judicially reviewed.").

**22.** See Moret v. Karn, 746 F.2d 989, 991 (3rd Cir.1984).

**23.** See Amanullah v. Nelson, 811 F.2d 1, 10–11 (1st Cir.1987).

**24.** See Marczak, 971 F.2d at 517 (citing Jean v. Nelson, 472 U.S. 846, 853, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985)); Moret, 746 F.2d at 993, n. 3 (noting same result would obtain under facially legitimate and bona fide reason standard). Both standards focus a reviewing court's attention on i) the legitimacy of the reason or reasons given for the action, and ii) whether there is some factual basis for the reason. See Marczak, 971 F.2d at 518 (district director required to articulate individualized facially legitimate and bona fide reason

that the "facially legitimate and bona fide reason" standard applies in the Fourth Circuit.[25] This deferential standard requires only that the district director articulate a permissible reason for his action and identify the factual basis in the record for that reason.[26] Thus, if the district director's termination of petitioner's parole is for a legitimate reason with some factual basis in the record, a reviewing court must defer to the district director's finding, even if the district court, on the information before it, would reach a different conclusion. Of course, facts and circumstances may change over time, and as they change, so, too, may the reasons for a district director's decision not to release an alien, provided the district director's discretionary decision continues to be based on a facially legitimate and bona fide reason for the decision.[27] And, importantly, the petitioner bears a "heavy" burden of showing that the public interest warrants parole. *See Bertrand v. Sava*, 684 F.2d 204, 212–13 (2nd Cir.1982) ("[T]he Attorney General's [and his designee's] exercise of his discretionary power must be viewed at the outset as presumptively legitimate and bona fide in the absence of strong proof to the contrary.").

■ Petitioners often dispute the factual basis asserted by a district director to support a denial of parole. Importantly, it is not for reviewing courts to weigh the facts in such disputes.[28] This is not to say that courts must simply and uncritically accept any factual basis a district director may assert. Rather, courts must examine the asserted factual basis given by a district director to support a legitimate reason for denying parole and determine whether that basis finds any support in the available, reasonably reliable evidence. If so, the judicial inquiry is at an end and deference is due the district director's exercise of discretion. If not—if no such evidence exists, or if the district director's reliance on the evidence that does exist is unreasonable or irrational—then the district director's decision is not entitled to deference.

for denying parole and some factual basis for decision); *Moret*, 746 F.2d at 992 (noting that " 'the court may not uphold the order unless it is sustainable on the agency's findings and for the reasons stated by the agency' ").

25. *See Joseph v. U.S. Immigration and Naturalization Service*, 993 F.2d 1537, 1993 WL 169035 (4th Cir.1993) ("[O]ur review [of the INS's discretion to parole into the United States] is limited to determining whether the INS in fact exercised its discretion and whether its exercise of discretion was 'on the basis of a facially legitimate and bona fide reason.' ") (citing *Bertrand v. Sava*, 684 F.2d 204, 212 (2d Cir.1982); *see also Singh v. U.S. Immigration and Naturalization Service*, 965 F.Supp. 724, 730 (D.Md.1997) ("[T]he standard of review of a decision of the Attorney General to deny parole is whether she had a 'facially legitimate and bona fide reason' for her decision.").

26. *See Marczak*, 971 F.2d at 518 ("We merely require the district director to have articulated some individualized facially legitimate and bona fide reason for denying parole, and some factual basis for that decision in each individual case."); *Schoenmetz v. Ingham*, 949 F.Supp. 152, 155 (W.D.N.Y.1996) ("The scope of [review of denial of parole], however,

is narrow. The district director's decision must be upheld as long as he has articulated some individualized facially legitimate and bona fide reason for denying parole and there exists in the record some factual basis for that decision."); *see also SEC v. Cheney Corp.*, 332 U.S. 194, 196–197 (1947) ("If the administrative action is to be tested by the basis on which it purports to rest, that basis must be set forth with such clarity as to be understandable.").

27. *See, e.g., Moret*, 746 F.2d at 991 ("[T]his court is not free to uphold the agency's determination on the basis of a post-hoc rationalization by the government.").

28. *See, e.g., Marczak*, 971 F.2d at 517–18 ("In concluding that there is no practical difference between applying one standard or the other, we do not take license, nor could we, to re-weigh the facts underlying the district director's decision."); *Bertrand*, 684 F.2d at 217 ("[The district director's] stated criteria were neither irrational nor unreasonable. The court was not empowered to disregard them or to substitute its own policy preferences for those of the official vested by law with discretionary authority to act on requests for parole.").

These principles, applied here, point persuasively to the conclusion that the district director's decision not to parole Haddam must be upheld. Here, the district director's stated reasons for Haddam's continuing detention, *i.e.*, a national security risk, a risk of absconding, and Haddam's failure to meet his burden in proving that his release is in the public interest, are all facially legitimate reasons. It remains then to determine only whether there is a proper factual basis to support these asserted reasons.

In his recent submissions, the district director has sufficiently identified a factual basis for at least two of the three stated reasons. First, regarding the risk Haddam poses to national security, the district director has pointed to information from the Department of State, the F.B.I., and Interpol suggesting Haddam's association with terrorism and other violent activities. Specifically, the district director has stated that he relied on (i) the February 1996 Department of State letter stating that Haddam had traveled to countries that sponsor terrorism and had traveled to South Africa at the invitation of Quibla, a violent radical anti-American organization, (ii) the 1993 F.B.I. letter stating that Haddam is the subject of INTERPOL warrants and is considered armed and dangerous, (iii) the Interpol warrants themselves, and (iv) the *in absentia* conviction for weapons smuggling. To be sure, these facts, and the weight to be accorded to these facts in determining the risk Haddam poses to national security, are not undisputed. Indeed, Haddam hotly disputes the facts asserted in these letters and warrants, as well as the legitimacy of the *in absentia* trial and conviction in Algeria, and there is some support in the record for Haddam's position.[29] But a district director's discretionary decision must be upheld if the district court is satisfied that the factual basis on which the district director relies has sufficient indicia of reliability such that reliance on those facts is neither irrational nor unreasonable.[30] Here, the district director relied on information provided by the Department of State and the F.B.I., information that was buttressed by other facts available to the district director, namely, Haddam's travel to two countries other than the country for which he was expressly granted advance parole. Moreover, the district director has articulated plausible reasons for not discounting the Interpol warrants and the *in absentia* conviction. Thus, in this case, the district director's reliance on this factual basis to support his conclusion that Haddam presents a risk to national security is neither irrational nor unreasonable.[31]

With respect to the risk of absconding, the district director pointed again to the February 1996 Department of State letter regarding Haddam's trips to the Sudan and Syria and to South Africa, and also to his extensive travel despite his apparent lack of financial resources. These facts, combined with the concerns raised by his finding of a risk to national security, serve as an adequate basis for the factual conclusion that Haddam poses a risk of absconding. Again, Haddam hotly disputes the significance to be accorded to the change in destination to Syria and the Sudan, but again, district courts, in reviewing parole decisions, conduct only a limited review to determine "whether the INS in fact exer-

---

**29.** *See supra* text accompanying notes 16–17.

**30.** *See Marczak,* 971 F.2d at 518–519 ("The district court could not, under the applicable standard, re-evaluate the evidence presented at the hearing and decide on its own whether the agency's decision was wise.").

**31.** Of course, the information the district director relied on may not ultimately be persuasive to the BIA in Haddam's exclusion pro-

ceedings. *See In re Anwar Haddam,* File # A22 751 813, at 18 (BIA September 10, 1998) (concluding that "[t]he evidence produced in this case is too attenuated" to conclude that Haddam was a persecutor of others). But that is irrelevant to the standard to be applied here, namely, whether there is "some factual basis in the record" to support the district director's discretionary decision. *See Marczak,* 971 F.2d at 518.

cised its discretion and whether its exercise of discretion was 'on the basis of a facially legitimate and bona fide reason.'" *See Joseph v. United States Immigration and Naturalization Service,* 993 F.2d 1537, 1993 WL 169035 (4th Cir.1993) (unpublished disposition). Here, the district director has exercised his discretion, and has provided facially legitimate reasons with some basis in the record.

In sum, because the district director had facially legitimate and bona fide reasons, supported by factual bases in the record, for revoking Haddam's parole and denying his release on bond and conditions, Haddam's petition must be denied.[32]

### III.

Accordingly, for the foregoing reasons, it is hereby **ORDERED** that Haddam's petition for writ of habeas corpus is **DENIED,** and the complaint **DISMISSED.**

The Clerk is directed to place this matter among the ended causes.

The Clerk is further directed to send a copy of this Order to all counsel of record.

---

**32.** It is worth noting that the conclusion reached here does not, of course, represent any judicial finding that Haddam is engaged in or associated with terrorism or that he is a risk of flight; instead, it is merely a judicial finding that the district director's decision is neither unreasonable nor irrational. And thus, it is open to the IJ, BIA or another reviewing court to reach conclusions contrary to the district director.

Also worth noting is that it is unnecessary to reach or decide here is the issue raised in *Cruz–Elias v. United States Attorney General,* 870 F.Supp. 692, 698 (E.D.Va.1994) of the "nightmarish scenario" where "an excluded alien, having committed no wrong other than arriving in the United States without its permission, faces the possibility of serving a de facto life sentence in an American prison because neither the United States nor another country wishes to accept him." Here, Haddam is still in the midst of exclusion proceedings, which, although progressing rather slowly, nonetheless provide opportunities for administrative and judicial review of his status. Should the IJ find that Haddam is statutorily ineligible for asylum based on the secret evidence, Haddam may then appeal to the BIA, and after that, if he so chooses, to the Fourth Circuit. Thus, the question of a "de facto life sentence" without review is not raised in these circumstances.