Anwar HADDAM, Petitioner,

v.

Janet RENO, Attorney General, et al., Respondents.

No. Civ.A.98–1579–A.

United States District Court, E.D. Virginia, Alexandria Division.

April 28, 1999.

versity Civil Litigation Program, Boston, MA, for Petitioner.

Dennis Michael Kennedy, U.S. Attorneys Office, Alexandria, VA, Joyce A.N. Massey, McCarthy & Massey, P.C., Manassas, VA, John M. McAdams, Jr., Office of Immigration Litigation, Civil Div., U.S. Dept of Justice, Washington, DC, for Respondents.

## MEMORANDUM OPINION

ELLIS, District Judge.

This petition for a writ of habeas corpus presents a threshold jurisdictional question, not yet resolved in this circuit, namely:

> Whether the 1996 amendments to the Immigration and Nationality Act (INA) [1] allow an excludable alien in the midst of an ongoing exclusion proceeding to obtain district court review of i) the INS's decision to incarcerate the alien indefinitely and deny release on any conditions and ii) the INS's *ex parte* use of secret evidence against the alien in the exclusion proceedings.

For the reasons set forth here, review of petitioner's claims regarding the INS's use of *ex parte* secret evidence must be sought in the court of appeals after the issuance of a final order in the administrative process, but under IIRIRA's transitional regime, habeas corpus jurisdiction exists in district court to review petitioner's detention-related claims.

### I.

Petitioner Anwar Haddam is a native and citizen of Algeria. He was admitted to the United States as a graduate student in 1980, and then returned to Algeria in 1984. In 1991, he was democratically elected to the Algerian parliament as a member of the Islamic Salvation Front (FIS). In 1992, the elections were nulli-

Malea Kiblan, Kiblan & Battles, McLean, VA, Susan Akram, Boston, MA, Uni-

---

1. The INA was amended twice in 1996, first in April, by the Antiterrorism and Effective Death Penalty Act (AEDPA), Pub.L. 104–132, 110 Stat. 1214 (April 24, 1996), and then again in September, by the Illegal Immigration Reform and Immigrant Responsibility Act (IIRIRA), Pub.L. 104–208, 110 Stat. 3009 (September 30, 1996).

fied by a military coup, following which Haddam fled Algeria and entered the United States on a visitor's visa on December 10, 1992. He currently serves as the chief of the FIS Parliamentary Delegation in Exile.

On April 9, 1993,[2] Haddam applied for political asylum and withholding of deportation pursuant to §§ 208(a) and 243(h)(1) of the INA.[3] Following this, he applied for and received advance parole from the INS on several occasions, which allowed him to travel abroad to conduct his activities as FIS's chief and its media spokesperson.[4] The latest parole grant was to be valid through February 16, 1997. In May 1996, the INS Chicago Asylum Office notified Haddam that it intended to deny his asylum application, and Haddam filed a prompt response. In October 1996, the Chicago Asylum Office denied his asylum application, and on December 5, 1996, the INS district director revoked Haddam's parole status. On December 6, 1996, Haddam was placed in detention, and, at the same time, served with notice that his parole status had been revoked.

Haddam has remained incarcerated continuously since December 1996, a period now exceeding two years.[5] During this period, the INS district director has rejected Haddam's several requests for release. The requests were rejected notwithstanding Haddam's willingness to accede to, and pay for, various release conditions, including house arrest and electronic monitoring. In response to his requests, the district director has issued two letters indicating i) that petitioner is a flight risk because he traveled to countries other than those for which advance parole was requested,[6] ii) that Haddam is not in any of the specific categories of persons whose detention, in general, is not in the public interest, iii) that Haddam had not met his burden of proof of establishing that his detention is not in the public interest under the factors, such as family members able to confer immigration benefits on the petitioner or petitioner's contributions to United States society, that must be considered for aliens who do not fall into one of the specified categories of aliens whose detention is generally not in the public interest, and iv) that Haddam has not held a job or paid any taxes in the United States, despite his extensive travel throughout the world since 1992. In the second letter, the director also noted that INTERPOL has indicated that three international warrants for Haddam's arrest in connection with alleged violent activity exist.[7]

---

2. This date varies in the pleadings: i) the government alleges that he applied on August 12, 1993, after the six-month visitor's visa had expired, ii) Haddam's attorneys use the April 9, 1993 date, and iii) the Board of Immigration Appeals (BIA) decision uses April 7, 1993 as the date. This conflict is immaterial to the resolution of the jurisdictional questions at bar.

3. These provisions are codified at 8 U.S.C. §§ 1158(a) and 1253(h)(1) (1996).

4. At least two of these parole grants were to allow Haddam to attend conferences designed to bring together the various Algerian factions to achieve a peaceful resolution of the ongoing unrest in Algeria. The government contends that Haddam in fact traveled to countries other than those for which he had sought advance parole.

5. Currently, Haddam is incarcerated at the medium security facility at FCI Petersburg.

6. It is not clear that the district director continues to rely on this ground to justify Haddam's protracted detention. Indeed, in the course of the hearings in this matter, government counsel has represented that the government no longer considers Haddam to be a flight risk, but instead continues his detention because it believes Haddam would represent a security risk if he were released and able to communicate freely. *See supra*, Part IV and n. 68.

7. At a hearing on the instant petition, the government's counsel suggested that Haddam's recent conviction and death sentence in absentia in Algeria might also play a role in the district director's continuing unwillingness to release Haddam, although the district director, as yet, has issued no letter to this effect.

The INS commenced exclusion proceedings against Haddam on December 10, 1996, four days after his incarceration.[8] These proceedings, which are still ongoing, have progressed at something less than breakneck speed. The Immigration Judge (IJ) originally scheduled the master calendar hearing in Haddam's exclusion proceeding for December 13, 1996. This hearing was continued at the request of both parties on various motions to allow settlement negotiations to continue. No settlement was reached, and a pretrial conference in the exclusion proceeding was held on March 21, 1997, at which time the government, for its part, stipulated that Haddam has a well-founded fear of persecution in Algeria and Haddam, for his part, conceded that he is excludable. After the denial of an interlocutory appeal regarding the ex parte use of secret evidence against Haddam, the IJ issued a decision and order on July 14, 1997, holding i) that he would not consider the secret evidence ex parte, in camera, as this would be fundamentally unfair, where, as here, the government would not provide Haddam with a summary of the evidence,[9] ii) that Haddam faced a well-founded fear of persecution if he returned to Algeria—indeed that there was a clear probability he would be tortured and killed if he returned—and therefore that Haddam was eligible for asylum and withholding, iii) that Haddam was a persecutor of others, and therefore that the IJ was required by statute to deny Haddam's request for asylum and withholding of deportation, and iv) that Had-

dam was to be excluded and deported, but not to Algeria because returning Haddam would violate the not yet implemented UN Convention Against Torture. Both sides appealed the order to the Board of Immigration Appeals (BIA).

On September 10, 1998, almost a year and a half later, the BIA issued a decision on the appeal, concluding i) that the IJ was statutorily required to review the secret evidence ex parte and in camera to determine its relevancy and could exclude such evidence only if irrelevant,[10] ii) that there was no admissible evidence in the current record that Haddam participated in, directed, or incited the persecution of others, and iii) that the IJ had no power to act under the UN Convention Against Torture until the Convention was implemented. The BIA remanded the case for expeditious review of the classified secret evidence. On remand, the IJ expressed his view on the record that .the use of the secret evidence was fundamentally unfair, and for this reason recused himself. On November 13, 1998, a newly-appointed IJ received the secret evidence.[11] A week later this IJ held another hearing at which Haddam and his daughter testified. The IJ then heard further secret evidence on December 17, 1998, and thereafter apparently closed the proceeding. No ruling or final order has yet issued.

On January 13, 1997, just over a month after his exclusion proceeding began, Haddam filed here his first petition for writ of habeas corpus. That petition was denied at a hearing on January 17, 1997.[12] Al-

---

8. Haddam renewed his applications for asylum and withholding of deportation within the context of these proceedings.

9. This record does not reflect the nature or precise government security classification of this evidence.

10. The BIA also found that "until the Immigration Judge has reviewed the Service's submission and determined its relevance in these proceedings, we find that it would be premature to make any ruling on the fundamental fairness of considering this evidence." *See In re Anwar Haddam*, File # A22 751 813 (BIA September 10, 1998).

11. Petitioner submitted an "Amended Statement of Facts" stating that the secret evidence "has been heard and found to be relevant." The Amended Statement of Facts is not verified, however, and the IJ has not apparently ruled; thus, the record does not establish that the evidence has in fact been found relevant.

12. At this hearing, this Court ruled (i) that the district director did not abuse his discretion in denying parole, (ii) that the burden was on the petitioner to show that the public interest favored his release, not on the director to show that his release was not in the public

most two years later, long after the BIA issued its decision on Haddam's petition, but before the second IJ heard the secret evidence, on October 29, 1998, the instant petition for habeas corpus relief was filed. In this second petition, Haddam again seeks a writ of habeas corpus, as well as temporary and permanent injunctions prohibiting his continued incarceration and barring his deportation until the merits of this petition and the exclusion proceeding have been resolved, including any appeals.[13] According to the petition, which consists of fourteen counts, this relief is warranted given (i) the revocation of advance parole, (ii) the denial of bond and release, (iii) the conduct of the exclusion

hearings, particularly the *ex parte* use of secret evidence, and (iv) petitioner's transfer to a Virginia Beach facility while awaiting further administrative action.[14] In late December, this Court heard initial argument on the jurisdictional issues raised by the instant petition, but deferred ruling to allow additional briefing on decisions announced immediately prior to the hearing. Since that hearing, the parties have been attempting, without success, to resolve this matter by locating a mutually satisfactory country to accept Haddam.[15]

## II.

■ Judicial review of immigration decisions is generally governed by the INA. In

---

interest, and (iii) that the petitioner received proper notice regarding his parole termination. *See Haddam v. Carroll*, Civ. No. 97–045–A (E.D.Va. Jan. 17, 1997); 8 U.S.C. § 1182(d)(5)(A) (parole only available where "significant public benefit exists"); *Joseph v. United States Immigration and Naturalization Service*, 993 F.2d 1537, 1993 WL 169035 (4th Cir.1993) (unpublished disposition) ("[INS's] discretion [as to parole of excludable aliens] is extremely broad: our review is limited to determining whether the INS in fact exercised its discretion and whether its exercise of discretion was 'on the basis of a facially legitimate and bona fide reason.' ").

Not available at this hearing were two documents that petitioner now contends warrant a second review of the district director's refusal to release petitioner. The first is a Department of State (DoS) letter, which although written prior to the hearing was not disclosed to petitioner until DoS responded to a Freedom of Information Act request in June 1998. In the letter, the DoS recommended that "Haddam not be removed to Algeria upon the completion of the exclusion hearing." The letter further stated that "the prolonged detention of this highly visible Algerian political figure could also fuel hostility to American interests in Algeria." This DoS letter is not, however, the INA-required DoS advisory letter, but rather is a letter from the DoS Executive Secretary to the INS Executive Secretary. The second document is the required, official DoS advisory letter, which took no real position, but did state that "Algerian officials have not offered any evidence to support the allegations in the warrant," *i.e.*, the warrants issued through Interpol and noted by the district director in his second letter to Haddam.

**13.** Haddam also seeks costs and attorney's fees for this action under the Equal Access to Justice Act, 28 U.S.C. § 2412 (1994 & Supp. II 1996).

**14.** More precisely, petitioner asserts that the denial of bond and release amounts to three separate violations of INA and a violation of due process (Counts 1–4), the denial of withholding of exclusion and deportation is a denial of due process and a violation of INA (Counts 5–6), the denial of asylum is a violation of due process and a violation of INA (Counts 7–8), the alleged denial of access to counsel/interference with right to counsel through the facility transfer is a violation of INA, a violation of INS regulations, and a violation of due process (Counts 9–11), the denial of right to withdraw application for admission is a violation of due process (Count 12), the failure of the IJ to review exculpatory evidence is a violation of due process (Count 13), and the conduct of the hearings violated First Amendment procedural rights (Count 14).

**15.** The United States has formally contacted both the United Kingdom (UK) and France in furtherance of this effort. An exclusion order has been issued by the UK preventing Haddam from entering that country, and although the UK agreed last year to reconsider that order, the status of the reconsideration is unknown. In the last eighteen months, at least eleven nations, including eight nations in Africa, Australia (formally), and the UK (informally), have rejected the United States' request that they accept Haddam. Further, Norway was also contacted, not by the government, but on Haddam's behalf, by the private entity known as the St. Edigio Society. This contact was also to no avail.

1996, two statutes amending the INA, namely, AEDPA [16] and IIRIRA,[17] significantly restricted the availability of judicial review of immigration decisions issued under the INA, ostensibly to expedite the removal of illegal aliens.[18] It is the impact of these provisions that is at issue here, as the government contends that this Court's jurisdiction over Haddam's petition, even under 28 U.S.C. § 2241, has been removed by the enactment in IIRIRA of a new provision, § 242(g) of the INA, codified at 8 U.S.C. § 1252(g).

Analysis properly begins with a review of the applicable law. In this regard, a brief review of the procedures for judicial review of immigration decisions prior to the 1996 amendments sets the stage for analysis of the effect of the 1996 amendments. In the pre–1996 regime, separate proceedings existed for review of exclusion and deportation orders,[19] although exhaus-

tion of administrative remedies was required for both.[20] Aliens in exclusion proceedings, such as Haddam, were limited to habeas corpus review in the district court, as set forth in the former INA § 106(b).[21] Aliens in deportation proceedings were subject to the provisions of former INA § 106(a), under which these aliens could seek review of final orders only in the court of appeals.[22] Deportable aliens were also granted the right, in INA § 106(a)(10), to seek district court habeas corpus relief that was at least co-extensive with the right to seek such relief under 28 U.S.C. § 2241.[23] Thus, the INA explicitly provided habeas corpus review in the district court for both excludable and deportable aliens.

AEDPA, enacted in April 1996, began the process of streamlining the procedures to expedite judicial review of immigration

---

**16.** *See* AEDPA, Pub.L. 104–132, 110 Stat. 1214 (April 24, 1996).

**17.** *See* IIRIRA, Pub.L. 104–208, 110 Stat. 3009 (September 30, 1996).

**18.** *See,* for example, H.Rep. No. 104–469(I) (March 4, 1996), which states the purpose of the sections of the house bill containing the new judicial review provisions eventually included in IIRIRA as follows:

Existing procedures to deny entry to and to remove illegal aliens from the United States are cumbersome and duplicative. Removal of aliens who enter the United States illegally, even those who are ordered deported after a full due process hearing, is an all-too-rare event. The asylum system has been abused by those who seek to use it as a means of "backdoor" immigration. H.R. 2202 streamlines rules and procedures for removing illegal aliens, and establishes special procedures for removing alien terrorists. Aliens who arrive in the United States with no valid documents will be removed on an expedited basis; arriving aliens with credible asylum claims will be allowed to pursue those claims. For illegal aliens already present in the U.S., there will be a single form of removal proceeding, with a streamlined appeal and removal process. To avoid removal, aliens must establish in such proceedings that they are entitled to be admitted or to remain in the United

States. Relief from deportation will be more strictly limited. Aliens ordered removed who do not depart on time will be subject to civil penalties and excluded from certain immigration benefits.

**19.** *See* INA § 106(a) and (b), 8 U.S.C. § 1105a(a) and (b) (repealed by IIRIRA).

**20.** *See* 8 U.S.C. § 1105a(c) (repealed by IIRIRA) ("An order of deportation or of exclusion shall not be reviewed by any court if the alien has not exhausted the administrative remedies available to him as of right under the immigration laws and regulations or if he has departed from the United States after the issuance of the order.").

**21.** *See* 8 U.S.C. § 1105a(b) (repealed by IIRIRA) ("Notwithstanding the provisions of any other law, any alien against whom a final order of exclusion has been made heretofore or hereafter under the provisions of section 1226 of this title or comparable provisions of any prior Act may obtain judicial review of such order by habeas corpus proceedings and not otherwise.").

**22.** *See* 8 U.S.C. § 1105a(a)(2) (repealed by IIRIRA).

**23.** *See* INA § 106(a)(10), 8 U.S.C. § 1105a(a)(10) ("[A]ny alien held in custody pursuant to an order of deportation may ob-

decisions. A principal focus of AEDPA was criminal aliens, namely those aliens who committed certain crimes specified by statute while in the United States. In this regard, AEDPA repealed INA § 106(a)(10), and replaced it with a provision that severely restricted all judicial review for criminal aliens.[24] Significantly, the new § 106(a)(10) did not address habeas corpus review for non-criminal aliens.

IIRIRA, enacted roughly six months later, became effective on April 1, 1997, and carried forward the streamlining process begun in AEDPA. Under IIRIRA's regime, exclusion and deportation proceedings are now considered "removal" proceedings,[25] with one unitary system for judicial review of both.[26] Thus, IIRIRA § 306 repeals INA § 106 in its entirety,[27] and replaces it with revised INA § 242, codified at 8 U.S.C. § 1252, which makes

clear that aliens in removal proceedings may obtain judicial review only in the courts of appeal after exhaustion of remedies.[28]

The next question then is the effective date of IIRIRA, which IIRIRA itself addresses. Under IIRIRA § 306(c), the effective date of the new provisions is governed by IIRIRA § 309,[29] which in turn results in an effective date of April 1, 1997.[30] IIRIRA then proceeds to establish two regimes depending on whether a petition is filed before or after the effective date of April 1, 1997. For those aliens already in deportation or exclusion proceedings as of the effective date of IIRIRA, IIRIRA § 309 sets forth a transitional regime,[31] which provides that, although the pre-IIRIRA procedure still applies,[32] aliens seeking review of exclusion orders

tain judicial review thereof by habeas corpus proceedings.") (repealed by AEDPA).

24. *See* INA § 106(a)(10), 8 U.S.C. § 1105a(a)(10) ("[A]ny final order of deportation against an alien who is deportable by reason of having committed a [covered] criminal offense... shall not be subject to review by any court.") (repealed by IIRIRA).

25. *See Richardson v. Reno*, 162 F.3d 1338, 1346 (11th Cir.1998), *petition for cert. filed,* 67 U.S.L.W. 3561 (February 23, 1999) ("As one of its broad structural changes to the INA, IIRIRA eliminated some of the distinctions between 'deportation' and 'exclusion' proceedings and created a unified set of proceedings in INA § 240 called 'removal proceedings.'").

26. *See* IIRIRA § 306(a), codified at 8 U.S.C. § 1252.

27. *See* IIRIRA § 306(b).

28. *See generally* IIRIRA § 306(a), 8 U.S.C. § 1252. Specifically, § 1252(b)(9) provides: Judicial review of all questions of law and fact, including interpretation and application of constitutional and statutory provisions, arising from any action taken or proceeding brought to remove an alien from the United States under this title shall be available only in judicial review of a final order under this section.
8 U.S.C. § 1252(d)(1) provides that "[a] court may review a final order of removal only if the alien has exhausted all administra-

tive remedies available to the alien as of right."

29. *See* IIRIRA § 306(c)(1) (as amended by Pub.L. 104–302, § 2(1), 110 Stat. 3657) ("Subject to paragraph (2), the amendments made by subsections (a) and (b) shall apply as provided in § 309, except that subsection (g) of section 24th of the Immigration and Nationality Act (as added by subsection (a)), shall apply without limitation to claims arising from all past, pending, or future exclusion, deportation, or removal proceedings under such Act.").

30. *See* IIRIRA § 309(a) ("Except as provided in this section and [certain sections, including 306(c)] of this division, this subtitle and the amendments made by this subtitle shall take effect on the first day of the first month beginning more than 180 days after the date of the enactment of this Act.").

31. *See* IIRIRA § 309(c)(4)(A).

32. *See* IIRIRA § 309(c)(1), which provides:

Subject to the succeeding provisions of this subsection, in the case of an alien who is in exclusion or deportation proceedings as of the title III–A effective date—
(a) the amendments made by this subtitle shall not apply, and
(b) the proceedings (including judicial review thereof) shall continue to be conducted without regard to such amendments.

must follow the rules that previously applied to aliens seeking review of final deportation orders, contained in INA § 106(a),[33] and continue to follow INA § 106(c).[34] In short, excludable aliens under the transitional regime are also generally limited to court of appeals review of final orders after exhaustion of administrative remedies.

This does not end the matter, however, because IIRIRA explicitly provided for retroactive application of one section, namely, INA § 242(g), codified at 8 U.S.C. § 1252(g),[35] which states:

> Exclusive jurisdiction—Except as provided in this section and notwithstanding any other provision of law, no court shall have jurisdiction to hear any cause or claim by or on behalf of any alien arising from the decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders against any alien under the INA.

The threshold jurisdictional question that must be addressed in this case arises from this provision.[36] More specifically, the threshold question is how to read § 1252(g) and its effective date provision in conjunction with the transitional rules. This problem of statutory construction was understandably labeled a Gordian knot by courts addressing the issue.[37] Some courts had held that the retroactive application requirement necessarily nullified the transitional rules i) because if the provision is to be applied retroactively, it must apply in transitional cases, ii) because the provision provides that "no court shall have jurisdiction," except "as provided in this section," referring only to § 1252, and iii) because the transitional cases are not covered by § 1252.[38] Other courts held that § 1252(g) did not apply at all in conjunction with the transitional rules, despite the language of its effective date provision.[39] Yet another court found that

**33.** 8 U.S.C. § 1105a(a) (repealed by IIRIRA).

**34.** 8 U.S.C. § 1105a(c) (repealed by IIRIRA).

**35.** Section 306(c) of IIRIRA specifically provides that, unlike the rest of the § 242, § 242(g) applies "without limitation to claims arising from all past, pending or future exclusion, deportation, or removal proceedings under [the Immigration and Naturalization] Act."

**36.** The debate in the courts over whether the actual effective date of § 242(g) was the date of IIRIRA's enactment, September 30, 1996, or its effective date, April 1, 1997, does not affect this analysis as both dates have long since passed. *See, e.g., Pak v. Reno*, 8 F.Supp.2d 1001, 1003 n. 3 (N.D.Ohio 1998) ("While there is some discussion among the courts as to whether § 242(g) was effective on September 30, 1996 or April 1, 1997, all courts agree that the language of § 306(c)(1) indicates a clear intent to apply this section retroactively. Therefore, because this case was filed after April 1, 1997, § 242(g) applies.").

**37.** *See, e.g., Marriott v. Ingham*, 990 F.Supp. 209, 212 (W.D.N.Y.1998) ("Thus, § 242(g) applies to this action in any event. As a consequence, § 242(g) by its terms bars this or any other court from hearing Marriott's claim '[e]xcept as provided in' 8 U.S.C. § 1252 .... Because of the IIRIRA transition provisions,

however, the review provided for under § 1252 does not apply to Marriott. .... Untangling this statutory Gordian knot is not a simple task, as is evidenced by the large number of cases in which courts have struggled with sorting out the interplay of AEDPA, IIRIRA, and INA.").

**38.** *See Magana–Pizano v. INS*, 152 F.3d 1213, 1217 (9th Cir.1998), *vacated*, —— U.S. ——, 119 S.Ct. 1137, 143 L.Ed.2d 206 (1999); *see also Goncalves v. Reno*, 144 F.3d 110, 122 (1st Cir.1998), *cert. denied*, —— U.S. ——, 119 S.Ct. 1140, 143 L.Ed.2d 208 (1999) ("As new INA § 242 is only applicable for aliens subject to IIRIRA's "permanent rules," and as new INA § 242(g) is applicable immediately, aliens subject to the transitional rules—i.e., every alien now in the administrative process whose case began prior to April 1, 1997— could not obtain any judicial review because they cannot take advantage of "this section," *i.e.*, new INA § 242.").

**39.** *See Perez v. Reno*, 18 F.Supp.2d 674, 680 (W.D.Tex.1998) (finding that § 242(g) does not apply to cases applying transitional rules); *Sabino v. Reno*, 8 F.Supp.2d. 622, 633–34 (S.D.Tex.1998) ("The literal language of the second part of section 306(c)(1) thus appears not only to contradict section 309(c)(1) but to make the transitional rules a nullity .... There does not appear to be any interpretation of

§ 1252(g) applies but incorporates and makes certain other provisions of § 1252 retroactive, as well.[40] Finally, some courts found that § 1252(g) applies retroactively in conjunction with the transitional rules, without addressing the potentially nullifying effect of such a conclusion on the transitional rules.[41]

The Supreme Court recently cut this Gordian knot in an unexpected way.[42] In *Reno v. American–Arab Anti–Discrimination Committee*, —— U.S. ——, 119 S.Ct. 936, —— L.Ed.2d—— (1999), the Supreme Court, in an opinion by Justice Scalia, found that § 1252(g) "performs the function of categorically excluding from non-final order review—even as to transitional cases otherwise governed by § 1105a rather than the unmistakable "zipper" clause of § 1252(b)(9)—certain speci-

fied decisions and actions of the INS," namely, the " 'decision or action' " of the Attorney General to " 'commence proceedings, adjudicate cases, or execute removal orders.' " *Id.* at 943. In short, the Supreme Court found that "[s]ection 1252(g) was directed against a particular evil: attempts to impose judicial constraints upon prosecutorial discretion." *See id.* at 944, n. 9. In those cases, and only those cases, the Supreme Court found that "8 U.S.C. § 1252(g) deprives the federal courts of jurisdiction." *See id.* at 947.

Thus, the threshold question presented here is whether the actions or decisions at issue here are barred, as the government contends, by § 1252(g). They are not because the decisions to detain Haddam and to use secret evidence in the course of the

the second part of section 306(c)(1) that is consistent with sections 309(c)(1) and 309(c)(4). Nevertheless, in order to be consistent with the Fifth Circuit's application of the transitional rules in de Garcia and Nguyen, the court cannot read the language of the last part of section 306(c)(1) as making section 242(g) retroactive in this case.").

**40.** *See American–Arab Anti–Discrimination Committee v. Reno*, 119 F.3d 1367, 1374 (9th Cir.1997), *vacated*, —— U.S. ——, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999).

**41.** *See Auguste v. Reno*, 152 F.3d 1325, 1328 (11th Cir.1998) ("[A]lthough section 309(c)'s transition rules govern most of IIRIRA's judicial review system for deportation orders. 242(g) is explicitly excluded, and therefore applies retroactively to those aliens, like Auguste, who were in deportation proceedings as of April 1, 1997."); *see also Lalani v. Perryman*, 105 F.3d 334, 336 (7th Cir.1997) (§ 242(g) applies retroactively after April 1, 1997).

**42.** The Supreme Court rejected the approaches generally followed by the lower courts, as well as the positions advocated by both parties before it in *Reno v. American–Arab Anti–Discrimination Committee*, —— U.S. ——, 119 S.Ct. 936, 142 L.Ed.2d 940 (1999) [hereinafter *AAADC*]. A review of the cases revealed only one Fifth Circuit decision that even suggested the path the Supreme Court eventually took in *AAADC*. In *Humphries v. Various Federal USINS Employees*, 164 F.3d

936 (5th Cir.1999), in analyzing the phrase "arising from" in § 1252(g), the Fifth Circuit panel defined the two ends of the spectrum of cases that could be considered to arise from the specified decisions. At one end of the spectrum were those cases clearly not "arising from" decisions to commence proceedings, adjudicate cases, or execute removal orders, namely "those claims with no more than a weak, remote or tenuous connection to a 'decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders;' " at the other end were those clearly arising from such decisions, namely "those claims connected directly or immediately with a 'decision or action by the Attorney General to commence proceedings, adjudicate cases, or execute removal orders.' " *See Humphries*, 164 F.3d at 943–44 (5th Cir.1999) (concluding that claims for involuntary servitude and mistreatment while in detention do not arise from decision or action to "commence proceedings, adjudicate cases, or execute removal orders," but claim for retaliatory exclusion does and thus is barred under § 1252(g)). The Supreme Court essentially concluded in *AAADC* that only cases falling at the very end of the spectrum identified by the Fifth Circuit are covered by § 1252(g). *See AAADC*, —— U.S. at ——, 119 S.Ct. at 943, 142 L.Ed.2d 940. As Justice Stevens concluded, a more sensible reading of § 1252(g) would recognize that the use of the word "section" rather than "Act" was a mere "scrivener's error." *See id.* at 950–51 (Stevens, J., concurring in the judgment). Nonetheless, the majority's interpretation, now binding, will be applied here.

exclusion proceeding are not included in the "specified decisions or actions of the INS" identified by the Supreme Court. The Supreme Court's method of cutting the Gordian knot requires a strictly literal reading of the language of § 1252(g),[43] and neither the decision to detain nor the deci- sion to use secret evidence falls within the provision's literal language. While the de- cision to detain is ancillary to the decision to commence proceedings, it is nonetheless a separate and distinct decision that does not involve the exercise of prosecutorial discretion, and hence cannot be character- ized as falling within one of the "three discrete actions" of the Attorney General covered by § 1252(g). At least one circuit has already so held.[44]

Thus Haddam's petition, as it is not barred by § 1252(g), must be analyzed un- der the former § 1105a, as modified by the transitional regime. This conclusion raises one additional jurisdictional question that must be addressed briefly, namely, the effect on § 2241 habeas corpus jurisdiction of AEDPA's repeal of the former INA provision § 106(a)(10), the provision that formerly provided habeas corpus jurisdic- tion in the immigration context. The de- bate in the circuits as to the continued

existence of § 2241 habeas corpus jurisdic- tion after IIRIRA has focused largely on the interpretation of § 1252(g) and § 1252(b)(9), which suggest that such jur- isdiction has been severely limited or even eliminated, rather than on the mere ab- sence or repeal of an express provision in the INA providing for such jurisdiction.[45] In the context of the transitional regime, only the repeal itself of INA § 106(a)(10) even suggests that habeas jurisdiction might be limited in immigration cases. Without more, that repeal alone is insuffi- cient to support the conclusion that Con- gress intended to repeal § 2241 jurisdic- tion as well, and thus there is jurisdiction under the transitional regime for district court review of appropriate claims.[46] The question of what presents an appropriate claim is yet another issue that must be addressed before turning to the merits.

### III.

Haddam asserts two distinct claims, namely, that his continued detention vio- lates federal law and the Constitution, and that the use of secret evidence in his exclu- sion proceeding and to deny asylum and withholding of deportation is a violation of

---

43. *See id.* at 943 ("We think the seeming anomaly that prompted the parties' strained readings of § 1252(g) ... is a mirage.... In fact, what § 1252(g) says is much narrower. The provision applies only to three discrete actions that the Attorney General may take: her 'decision or action' to 'commence pro- ceedings, adjudicate cases, or execute remov- al orders.' ...

"It is implausible that the mention of three discrete events along the road to deportation was a shorthand way of referring to all claims arising from deportation proceedings.")

44. *See Parra v. Perryman,* 172 F.3d, 954 (7th Cir.1999) ("Parra, by contrast, did not ask the district court to block a decision 'to com- mence proceedings, adjudicate cases, or exe- cute removal orders against any alien under this chapter.' His claim concerns detention while the administrative process lasts, and it may be resolved without affecting the pending proceeding. Section 1252(g) therefore does not foreclose review....").

45. *See AAADC,* —— U.S. at ——, n. 7, 119 S.Ct. at 942, n. 7 (noting disagreement among courts of appeals as to whether habeas review is still available after IIRIRA).

46. *See Felker v. Turpin,* 518 U.S. 651, 659, 116 S.Ct. 2333, 135 L.Ed.2d 827 (1996) (not- ing that repeals by implication are not fa- vored); *see also Eltayeb v. Ingham,* 950 F.Supp. 95, 99 (S.D.N.Y.1997) (concluding that 28 U.S.C. § 2241 habeas corpus jurisdic- tion remained after the enactment of AED- PA); *Mbiya v. INS,* 930 F.Supp. 609, 612 (N.D.Ga.1996) (concluding 28 U.S.C. § 2241 habeas corpus jurisdiction remained after the enactment of AEDPA but only to the extent required by the Constitution, namely where deportation would result in fundamental mis- carriage of justice); *Dunkley v. Perryman,* 1996 WL 464191, at \*2–3 (N.D.Ill. Aug.9, 1996) (finding jurisdiction under § 2241 re- mained after AEDPA's repeal of INA § 106(a)(10)).

federal law and the Constitution.[47] Under § 1105a(a), a petition for review in the court of appeals "shall be the sole and exclusive procedure for the judicial review of all final orders of deportation." In interpreting the term "final orders," the Supreme Court has stated that final orders include " 'all matters on which the validity of the final order is contingent, rather than only those determinations actually made at the hearing.' "[48] Thus, as § 309 of IIRIRA makes § 1105a applicable to aliens in exclusion proceedings, such as Haddam, the next question is whether the issues raised by Haddam would fall within the scope of final orders subject to exclusive review in the court of appeals.

## A. Use of Secret Evidence in Exclusion Proceedings

 The use of secret evidence against a party, evidence that is given to, and relied on, by the IJ and BIA but kept entirely concealed from the party and the party's counsel, is an obnoxious practice, so unfair that in any ordinary litigation context, its unconstitutionality is manifest. But whether this obnoxious practice, in the special circumstances of this case, violates constitutional norms is a more difficult question, which it is neither necessary, to reach nor to decide.

Under the facts of this case, it is apparent that if a final order of exclusion issues, its validity will depend on the secret evidence. Thus, the BIA examined Haddam's case, concluded that there was no record evidence from which to find Haddam a persecutor of others, and remanded the case for consideration of the secret evidence. Therefore, any decision finding statutory ineligibility for asylum and withholding of deportation must necessarily be based on the secret evidence.[49] From this, it follows that a challenge to the use of secret evidence is directly a challenge to the validity of any final order of exclusion and denial of asylum that may issue. Accordingly, because a challenge to the secret evidence is essentially a challenge to the anticipated final order, it further follows that the challenge falls within the exclusive jurisdiction of the courts of appeals.

Significantly, courts have noted that the statutory exhaustion requirement of § 1105a(c) is "coextensive with the exclusivity provision of section 1105a(a)."[50] In other words, exhaustion of administrative remedies is required where a challenge would fall within the exclusive jurisdiction of the courts of appeals, namely, in all matters on which the validity of the final order is contingent. Thus, exhaustion is statutorily required here, after which an appeal may be filed with the appropriate circuit court.[51] Moreover, even if exhaus-

---

**47.** At this point, it appears that Haddam no longer presses the claims asserted with respect to his transfer to the Virginia Beach Facility, given government counsel's representation that arrangements with supervisory personnel at Haddam's detention facility have been made to ensure a reasonable opportunity for communication between Haddam and his counsel. Thus, these claims, Counts 9–11, are not addressed here, and are appropriately dismissed as moot.

**48.** See I.N.S. v. Chadha, 462 U.S. 919, 938–39, 103 S.Ct. 2764, 77 L.Ed.2d 317 (1983) (distinguishing Cheng Fan Kwok v. I.N.S., 392 U.S. 206, 213, 88 S.Ct. 1970, 20 L.Ed.2d 1037 (1968), where alien did not attack deportation order itself, but instead sought relief not inconsistent with deportation order).

**49.** The IJ has apparently taken additional evidence from Haddam and his daughter. The limited nature of the remand suggests that such evidence must be related to the secret evidence. Thus, the hearing of additional evidence does not affect the conclusion reached here.

**50.** See El Rescate Legal Services, Inc. v. Executive Office of Immigration Review, 959 F.2d 742, 746 (9th Cir.1991) (concluding that "exhaustion of administrative remedies is statutorily required only if appellees are seeking to attack a final order of deportation or exclusion").

**51.** But see El–Youssef v. Meese, 678 F.Supp. 1508, 1516 (D.Kan.1988) (reviewing cases, concluding that district court has habeas corpus jurisdiction to hear all claims including

tion were not statutorily required, review would nonetheless be inappropriate where, as here, the decision of the IJ or the BIA might well moot the constitutional issue asserted. It is worth noting that the BIA may be competent to consider Haddam's secret evidence due process claim.[52] But even if not, Haddam may prevail notwithstanding the secret evidence, and be granted asylum by the IJ, or the BIA may conclude that the use of the evidence in this case is, in fact, fundamentally unfair

under the regulations. Either of these decisions would eliminate the need for a reviewing court to address the constitutional issue. Thus, whether understood in terms of ripeness[53] or exhaustion requirements,[54] the end result is the same: review of this question is premature at this time.[55]

## B. The Detention Decision

■ Although not entirely free from doubt, it appears that the decision as to

---

those that attack final deportation orders). *El–Youssef*, however, did not involve problems of exhaustion. *See id.*

**52.** *See Farrokhi v. U.S. Immigration and Naturalization Service*, 900 F.2d 697, 701 (4th Cir. 1990) ("Nothing appears to divest the BIA from hearing procedural due process claims that do not seek invalidation of congressional enactments."). Petitioner here appears to be asserting the unconstitutionality of the federal regulation allowing the use of secret evidence in INS proceedings, 8 C.F.R. § 240.33(c)(4)(iv), rather than a federal statute. But even if the constitutional issues could not be raised in a BIA appeal, review in this Court at this time would nonetheless be inappropriate. *See, e.g., Massieu v. Reno*, 91 F.3d 416, 423–24 (1996) (holding availability of meaningful judicial review in court of appeals after final order of constitutional claim not addressable in proceedings precluded review prior to exhaustion).

**53.** *See Abbott Laboratories, Inc. v. Gardner*, 387 U.S. 136, 148–49, 87 S.Ct. 1507, 18 L.Ed.2d 681 (1967) ("[The ripeness doctrine's] basic rationale is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties."); *see also Bedredin v. Sava*, 627 F.Supp. 629, 634 (S.D.N.Y.1986) (holding indefinite detention after final order of deportation because no country will accept alien not ripe issue until final order issues and noting lack of any indication that asylum petition would be pending indefinitely); *Lin v. Reno*, 1997 WL 215686 (E.D.N.Y.1997) (dismissing habeas petition on ripeness grounds where petitioner exhausted administrative remedies but change in INS policy allowed reopening of case).

**54.** *See, e.g., El Rescate*, 959 F.2d at 747 ("[T]his court has required exhaustion where the BIA, if allowed to address the claims first, might 'take action that would render unnecessary our consideration of constitutional issues.' ") (citation omitted); *see also McKart v. United States*, 395 U.S. 185, 194–95, 89 S.Ct. 1657, 23 L.Ed.2d 194 (1969) ("In addition, other justifications for requiring exhaustion in cases of this sort have nothing to do with the dangers of interruption of the administrative process. Certain very practical notions of judicial efficiency come into play as well. A complaining party may be successful in vindicating his rights in the administrative process. If he is required to pursue his administrative remedies, the courts may never have to intervene."); *Kashani v. Nelson*, 793 F.2d 818, 826 (7th Cir.1986) (holding that aliens may not seek district court review of district directors' denial of asylum petitions but instead must exhaust administrative remedies by renewing asylum petition in ensuing deportation hearings).

**55.** The chill to first amendment rights asserted here does not require more expeditious review than that afforded by the statute. *See United States v. Hollywood Motor Car Co.*, 458 U.S. 263, 268–70, 102 S.Ct. 3081, 73 L.Ed.2d 754 (1982) (in vindictive prosecution case, finding that "reversal of the conviction and, where the Double Jeopardy Clause does not dictate otherwise, the provision of a new trial free of prejudicial error normally are adequate means of vindicating the constitutional rights of the accused," and that "[i]t is only a narrow group of claims which meet the test of being 'effectively unreviewable on appeal from a final judgment.' "); *Massieu v. Reno*, 91 F.3d 416, 424–26 (3d Cir.1996) (holding that "[a]lthough the immigration judge is not authorized to consider the constitutionality of the statute, this court can hear that challenge upon completion of the administrative proceedings" in case asserting retaliatory selective enforcement for exercise of First Amendment rights).

detention stands on different footing.[56] The detention decision is distinct from, and indeed, not reviewable by, the court of appeals in the transitional regime.[57] In no way could the validity of any final order in this case be considered contingent upon the validity of the detention decision. Moreover, nothing in the record suggests that any administrative steps remain to be taken with respect to the detention decision, which is final and administratively exhausted. Thus, jurisdiction to review the detention decision under IIRIRA's transitional regime exists, and the issue must be decided on its merits.

## IV.

In reviewing the detention decision on the merits, the analysis again begins with a review of the applicable law. Under the relevant statute, 8 U.S.C. § 1182(d)(5)(A), the Attorney General may exercise her discretion to parole into the United States temporarily an alien "only on a case-by-case basis for urgent humanitarian reasons or significant public benefit." [58] The INS regulation enunciating the requirements under this statute, 8 C.F.R. § 212.5, states again that parole "would generally be justified only on a case-by-case basis for 'urgent humanitarian reason' or 'significant public benefit,' provided the aliens present neither a security risk nor a risk of absconding." [59] The regulation further states that termination of parole, on notice, shall occur i) when the purpose of the parole has been accomplished or ii) when the district director or chief patrol agent believe that neither humanitarian reasons nor public benefit warrants continued parole.[60]

■ Courts are not in accord on a precise verbal formulation of the judicial review standard for INS parole determinations. While some courts apply an "abuse of discretion" standard,[61] other courts apply a seemingly more deferential "facially legitimate and bona fide reasons" standard.[62] Yet other courts have noted that there appears to be no practical difference between these review standards.[63] Both

**56.** The doubt is suggested by the Eleventh Circuit's decision in *Richardson v. Reno*, which notes that detention orders are not collateral, but instead are inextricably part of removal proceedings. *See Richardson*, 162 F.3d at 1358, n. 100 ("Richardson also asserts that INA § 242(g) affects only final removal orders and that the INS ignores the critical distinction between review of interim detention orders—denying admission, bond and parole—and review of final removal orders. We disagree. The INS' interim orders and actions are not collateral proceedings but are inextricably part of the removal proceedings and covered by the broad language of INA § 242(g).") (citing *I.N.S. v. Chadha*, 462 U.S. 919, 938, 103 S.Ct. 2764, 77 L.Ed.2d 317, (1983); *Massieu v. Reno*, 91 F.3d 416 (3d Cir.1996)). The Eleventh Circuit's decision, however, was in the context of § 1252(g), which, as discussed above, is not applicable in this case.

**57.** *See, e.g., Gottesman v. U.S. Immigration and Naturalization Service*, 33 F.3d 383, 386 (4th Cir.1994) (finding lack of jurisdiction to review district director's decision to rescind status as lawful permanent resident and noting "carefully circumscribed jurisdictional grant [in § 1105a(a) ] does not allow federal circuit courts to review orders that are merely preliminary to, or associated with, a final order of deportation."); *see also El–Youssef*, 678 F.Supp. at 1516 (concluding that decision to detain pending deportation is not final deportation order subject to circuit court review because decision must be made separate from any deportability determinations and is made pursuant to different section of INA).

**58.** The Court notes that the wording of the statute was amended by IIRIRA. Nonetheless, the Court assumes for the purposes of decision that because it is Haddam's continuing detention that is challenged here, the current statute applies, but notes that the conclusions reached here would be the same under either wording.

**59.** *See* 8 C.F.R. § 212.5(a).

**60.** *See* 8 C.F.R. § 212.5(d)(2)(i).

**61.** *See Moret v. Karn*, 746 F.2d 989, 991 (3rd Cir.1984).

**62.** *See Amanullah v. Nelson*, 811 F.2d 1, 10–11 (1st Cir.1987).

**63.** *See Marczak v. Greene*, 971 F.2d 510, 517 (10th Cir.1992) (citing *Jean v. Nelson*, 472

standards are deferential and both focus a reviewing court's attention on i) the legitimacy of the reason or reasons given for the action, and ii) whether there is some factual basis for the reason.[64] Thus, under either standard, if the district director's termination of petitioner's parole is for a legitimate reason with some factual basis in the record, a reviewing court must defer to the district director's finding.[65]

At least one unpublished opinion suggests that the Fourth Circuit would apply the "facially legitimate and bona fide reason" standard.[66] Yet, even under this deferential standard, the district director must, at a minimum, articulate the reasons for its actions and identify the factual basis in the record for that reason.[67]

■ Here, the record is not clear as to the district director's reasons for deten-

tion, and thus review of either the legitimacy or the factual basis of those reasons cannot be confidently undertaken. To be sure, the district director initially presented two primary reasons for refusing to parole petitioner, namely i) the risk that petitioner might flee, and ii) the absence of any public interest favoring petitioner's release; the Court, in denying Haddam's first habeas corpus petition, found that both reasons provide adequate, independent grounds for the district director's determination. Yet, the government, in pleadings and in hearings on the instant petition, has suggested that neither risk of flight, nor absence of public interest was the reason for Haddam's continuing two year incarceration. It appears that national security is, at least at present, and possibly always was, the motivating force behind Haddam's continued detention.[68]

U.S. 846, 853, 105 S.Ct. 2992, 86 L.Ed.2d 664 (1985)); *Moret,* 746 F.2d at 993, n. 3 (noting same result would obtain under facially legitimate and bona fide reason standard).

**64.** *See Marczak,* 971 F.2d at 518 (district director required to articulate individualized facially legitimate and bona fide reason for denying parole and some factual basis for decision); *Moret,* 746 F.2d at 992 (noting that " 'the court may not uphold the order unless it is sustainable on the agency's findings and for the reasons stated by the agency' ").

**65.** The burden is on petitioner to show that the public interest warrants parole; this burden is a "heavy one." *See Bertrand v. Sava,* 684 F.2d 204, 212–13 (2nd Cir.1982) ("[T]he Attorney General's [and his designee's] exercise of his discretionary, power must be viewed at the outset as presumptively legitimate and bona fide in the absence of strong proof to the contrary.").

**66.** *See Joseph v. U.S. Immigration and Naturalization Service,* 993 F.2d 1537, 1993 WL 169035 (4th Cir.1993) ("[O]ur review [of the INS's discretion to parole into the United States] is limited to determining whether the INS in fact exercised its discretion and whether its exercise of discretion was 'on the basis of a facially legitimate and bona fide reason.' ") (citing *Bertrand v. Sava,* 684 F.2d 204, 212 (2d Cir.1982);) *see also Marczak v. Greene,* 971 F.2d 510 (10th Cir.1992) (applying "facially legitimate and bona fide reason"

standard). Neither party has cited any cases that suggest that the decision to revoke parole should be reviewed under a different or more stringent standard than the decision to grant or deny parole.

**67.** *See Marczak,* 971 F.2d at 518.

**68.** The government stated in explaining the "unbending consensus that Mr. Haddam not be released" in its "Federal Defendants/Respondents' Status Report on Specific Matters Identified in Court Order," filed on behalf of all the defendants, including the INS District Director, that "electronic monitoring and home detention are designed to diminish the risk of flight, but that is not the risk posed by Mr. Haddam.... At the request of this Court, we will not address the details of the national security risk posed by Mr. Haddam, but the risk is one which the United States takes seriously. Releasing him under conditions designed to curtail the likelihood of him absconding ... will have no impact on the risk to national security. His freedom outside of detention and his ability to facilitate communications are the threats that an ankle bracelet or home detention will not diminish." At hearing, the government back-pedaled, stating, "I hope that the Court does not look at this as a substitution for an opinion from the District Director, if, in fact, he reapplied for parole. This was not our intention to substitute our analysis, for example, if, in fact, he reapplied to the District Director for parole. The District Director may, in fact, list alterna-

Thus, although it is not clear that a different result would obtain depending on the reason asserted, no review of the district director's decision can occur on the current record. Therefore, a hearing is required at which the district director must articulate his reasons both for the initial decision to detain Haddam and for the continued decision to detain Haddam, which must then be measured against the applicable legal standard.[69]

## V.

Jurisdiction exists in district courts under § 2241 to hear appropriate habeas petitions from aliens whose cases are governed by the transitional regime set forth in IIRIRA. Though no jurisdiction exists here to review Haddam's petition as it relates to the conduct of and use of secret evidence in his administrative exclusion proceedings, and review of those issues must be sought in the court of appeals after the administrative process has concluded,[70] jurisdiction does exist to review Haddam's detention-related claims. As the current record is inadequate to review those claims decision, a hearing hall be scheduled, at which hearing, the district director will articulate both the reason for

the decisions, and the factual basis in the record for the decision.

An appropriate Order will issue.

---

tive means. This was a representation from us and from the authorities as to their current concerns. This was not a substitute opinion from a District Director with regard to parole. I want to make that clear on the record, if you understand the difference, your Honor." *See Haddam v. Reno, Transcript,* pp. 9–10, Civ. No. 98–1579–A (E.D.Va. February 17, 1999). Thus, at a minimum, the representations from counsel for the federal defendants, including the district director, have suggested that the reason for the continued detention of Haddam is not, and possibly never was, either of the two reasons cited in the earlier hearing.

69. That this is a second petition does not bar review here, as new evidence exists, and further, it is unclear that the district director's true reasons for Haddam's incarceration were reviewed under the first petition. *See* 8

U.S.C. § 1105a(c) (repealed by IIRIRA) ("No petition for review or for habeas corpus shall be entertained if the validity of the order has been previously determined in any civil or criminal proceeding, unless the petition presents grounds which the court finds could not have been presented in such prior proceeding, or the court finds that the remedy provided by such prior proceeding was inadequate or ineffective to test the validity of the final order.")

70. For the same reasons outlined in this Memorandum Opinion, two claims that were not the primary focus of Haddam's petition, namely, the denial of the review of exculpatory evidence and the denial of the right to withdraw his asylum application, must also be reviewed in the appropriate courts of appeal.